**Dennis Wayne LIMON, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–08–00551–CR.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

June 17, 2010.

Rick Holstein, Corpus Christi, for Appellant.

Patrick L. Flanigan, Dist. Atty., Retha E. Cable, Asst. Dist. Atty., Sinton, for Appellee.

Before Justices YAÑEZ, BENAVIDES, and VELA.

## OPINION

Opinion by Justice BENAVIDES.

Appellant, Dennis Wayne Limon, Jr., was convicted of deadly conduct with a firearm, a third-degree felony, and sentenced to three years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. *See* TEX. PENAL CODE ANN. § 22.05 (Vernon 2003); *id.* at § 12.34 (Vernon Supp. 2009). By a single issue, Limon argues that the trial court erred by denying his motion to suppress illegally-obtained evidence. We reverse and remand.

### I. BACKGROUND

Limon was indicted for the offense of deadly conduct with a firearm on August 14, 2007. On October 10, 2007, Limon filed a "Motion to Determine the Admissibility of Illegally Obtained Evidence and Statements." The trial court held a hearing on the motion on October 23, 2008.

Officer Gus Perez testified at the hearing on the motion to suppress that on June 28, 2007, he received a call at about 10:00 p.m. informing him that there was a shooting in Aransas Pass at the 1400 block of W. Matlock. On his way to that location, Officer Perez was advised that another shooting had occurred. He proceeded to the location of the second shooting, at 244 N. 11th Street.

At the scene of the second shooting, Officer Perez recovered three "shotgun waddings," which he described as projectiles from a shotgun. He spoke to a witness named "Lupe Ortiz" or "Guadalupe Ortiz," who advised that he had seen a green four-door car leaving the area. Ortiz could not provide a make, model, or license plate for the car. The rest of the witnesses at the residence were reluctant to cooperate.

Officer Perez then proceeded to the location of the first shooting. When he arrived, he was approached by a "person that live[d] in the vicinity who advised [him] that that person believed that the Limon kids were involved." Officer Perez admitted that he did not know the name of his informant, but he believed the person was a neighbor or resident that lived in the area.

Officer Perez testified that he knew of only one Limon family in Aransas Pass, and he knew where they lived. He went to the Limon residence, arriving at approximately 2:00 a.m., where he observed a green Buick four-door car. He felt the hood, which he stated was warm, and observed what appeared to be a bullet hole in the front passenger door. Officer Perez testified on cross-examination that the bullet hole indicated to him that the car had been shot at. Officer Perez then called for backup, and three other officers arrived within minutes.

Officer Perez testified that he did not have a search warrant or an arrest warrant, and it would have taken him about an hour and a half to two hours to get a warrant. Officer Perez went to the front door and knocked. The door was answered by A.S. Officer Perez testified that he knew that Limon's father (hereinafter

"Limon, Sr."), an adult, lived in the residence. On direct examination during the pretrial hearing, Officer Perez testified about A.S.'s identity and their encounter:

[State]: Do you know who [A.S.] is?

[Perez]: At the time I did not, but I later learned that [he] was a nephew of Mr. Limon and a cousin of the Defendant.

[State]: Okay. How old is [A.S.]? Do you know?

[Perez]: I'm not aware, sir.

[State]: Is he an adult?

[Perez]: I do not believe so.

[State]: What did you tell [A.S.], if anything?

[Perez]: I advised [A.S.] that I was investigating a shooting case and asked for permission to enter the residence.

[State]: And did he let you come in?

[Perez]: Yes, sir, he did.

[State]: Did any other officers come in with you?

[Perez]: Yes, sir, Officer Hernandez.

On cross-examination, Officer Perez further testified about the entry into the home:

[Defense]: And as you stood on the front porch how long a conversation did you have with this young man who is a juvenile [A.S.]?

[Perez]: It was a fairly short conversation. I advised him who I was, what department I was with[,] and why I was there.

[Defense]: And did you ask him if he owned or had possession of that residence?

[Perez]: I assumed that because he opened the door that he was one of the residents.

[Defense]: Okay. And did you ask him if there was someone there who was the owner or had greater right of possession to that residence?

[Perez]: No, sir, I did not.

[Defense]: And at the time that he approached[,] you indicated that you felt or you knew that he was not an adult; is that correct?

[Perez]: No. I indicated that I found out he wasn't an adult, but he's not a young kid. I believe he is maybe 14, 13, somewhere in that area.

[Defense]: So at the time you weren't sure?

[Perez]: That's correct.

[Defense]: Did you ask him for any identification?

[Perez]: No, sir, I did not.

[Defense]: Did you ask him how old he was?

[Perez]: No, sir, I did not.

[Defense]: Did you ask him what grade he had gone to school?

[Perez]: No, sir, I did not.

Officer Perez testified that while he was outside the home, he did not see any crimes visibly being committed inside or outside the home. He stated that when he arrived at the front door, he had a "reasonable suspicion that there was a suspect inside.... It was likely—I didn't know. It was approaching probable cause but more than a reasonable suspicion."

Once inside the home, Officer Perez smelled marijuana. He stated that he and Officer Hernandez went to the bedroom in the southwest corner of the residence, where they observed Limon and two other males lying in bed, apparently sleeping with the lights on. The officers had their guns drawn, and they told Limon and the two males to get up. Limon was handcuffed and moved into the common area of the home.

Officer Perez stated that another officer, Officer Rhodes, was outside the residence looking through a window into the southwest bedroom, and he informed Officer Perez that he saw weapons in the room. Officer Perez stated that "[t]here was [sic] two handguns towards the front where their heads were to the west side of the bed at which point we went ahead and detained everybody in the residence, secured them all so we could secure those weapons and see if there was [sic] any other weapons." Officer Perez stated that one of the handguns was a .22 caliber handgun and the other was a .380 caliber handgun.

Officer Perez testified that one of the officers went into the southeast bedroom, which belonged to Limon's parents, who were sleeping. Limon, Sr. was not dressed, and Mrs. Limon had a nightgown on. Both were handcuffed. Mrs. Limon was taken to a common area in the home, and Limon, Sr. was told to lie face down on the floor, despite being completely naked. Officer Perez testified that the officers "went ahead and got him some clothes, removed the hand restraints, and that's when we asked for consent."

Officer Perez stated that he asked for a written consent to search from Limon, Sr., who stated that he wanted to speak to his wife because he could not see. Mrs. Limon then gave written consent to search the home.

After obtaining consent, Officer Perez photographed the residence, and he testified that ammunition for a .22 caliber gun and a 12-gauge shotgun were found in the southwest bedroom, along with drug paraphernalia. He stated that, outside the residence in the vicinity of the southwest bedroom, the officers located a "Remington semiautomatic shotgun 12 gauge." Officer Perez agreed that the shotgun was "near the window of the southwest bedroom" in an area enclosed by a privacy fence belonging to the Limon residence.

After searching the residence and finding the guns, Officer Perez obtained consent to search the vehicle from Limon, who stated that his parents bought the vehicle for him to drive. In the vehicle, Officer Perez found a metal jacket from an unknown caliber weapon.

Officer Perez testified that at that time, he "felt that there was probable cause for the arrest," and he arrested Limon. Limon was transported to the police station and booked, which took approximately one hour. Limon was in the jail for about thirty minutes before he was given his *Miranda* warnings; following the warnings, at 5:01 a.m., he provided a statement.

The trial court denied Limon's motion to suppress without stating the grounds or issuing findings of fact and conclusions of law. At trial, when the State attempted to admit Limon's videotaped statement, the following exchange occurred:

[Defense]: Excuse me, Ms. Cable. Judge, at this time I would reassert the motions filed prior to trial, and I object to any testimony regarding those matters.

The Court: Would y'all come up for a second?

*(Bench conference)*

[State]: There was a motion to suppress the statement, and it was denied by Judge Whatley.

The Court: I'm showing an [sic] October of 2007 Judge Whatley heard that motion.

[Defense]: Right. And so I'm reasserting it for the purposes of getting a Court's ruling into the record on this matter.

The Court: Fine. I just want to be sure that we're all on the same page.

[Defense]: That is when we had it, October.

[State]: I don't remember the date.

[Defense]: Yeah.

[State]: I rely on the docket sheet.

[Defense]: And then—well, go ahead.

The Court: The Court will adopt the prior rulings of Judge Whatley in this matter. Your objection is overruled.

The evidence obtained from the search of the residence, the search of the car, and Limon's statement were admitted at trial, and Limon was convicted of deadly conduct by use of a firearm. *See id.* at § 22.05(b)(2), (e).

## II. STANDARD OF REVIEW

■ An accused seeking suppression of evidence based on an alleged unlawful search and seizure bears the burden of rebutting the presumption that the police conduct was proper. *Russell v. State*, 717 S.W.2d 7, 9 (Tex.Crim.App.1986); *Harris v. State*, 994 S.W.2d 927, 930 (Tex.App.-Waco 1999, pet. ref'd). To rebut the presumption, the accused must show that the search or seizure occurred without a warrant. *Johnson v. State*, 864 S.W.2d 708, 714 (Tex.App.-Dallas 1993), *aff'd*, 912 S.W.2d 227 (Tex.Crim.App.1995); *Harris*, 994 S.W.2d at 930. The burden of proof then shifts to the State to either produce a warrant or prove that the warrantless search or seizure was reasonable. *Russell*, 717 S.W.2d at 10; *Harris*, 994 S.W.2d at 930. Limon argued in his motion to suppress that the search of the home was made without a warrant in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I,

section 9 of the Texas Constitution, and articles 1.04, 1.06, and 38.23 of the Texas Code of Criminal Procedure. U.S. CONST. amend. IV, XIV; TEX. CONST. art. I, § 9; TEX.CODE CRIM. PROC. ANN. arts. 1.04, 1.06, 38.23 (Vernon 2005).[1] Thus, the burden shifted to the State to prove an exception to the warrant requirement.

■ "Voluntary consent to search is a well-established exception to the warrant and probable cause requirements of the Fourth Amendment to the United States Constitution." *Montanez v. State*, 195 S.W.3d 101, 105 (Tex.Crim.App.2006). While under the federal constitution, the State must prove consent by a preponderance of the evidence, our State constitution requires the state to prove voluntary consent by clear and convincing evidence. *Id.* (citing TEX. CONST. art. I, § 9).[2]

■ "[W]hen reviewing a trial court's decision to deny a motion to suppress, an appellate court 'should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor.'" *Id.* (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.App.1997)). We afford the same deference to rulings applying law to fact questions, otherwise known as mixed questions of law and fact, "'if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.'" *Id.* (quoting *Guzman*, 955 S.W.2d at 89). "Finally, an appellate court may conduct a de novo review where the resolution of mixed questions of law and fact does not turn on an evaluation of credibility and demeanor."

---

1. Limon did not argue below, and does not argue to this Court, that the standards for admitting evidence under any of these provisions is different from the federal constitutional analysis.

2. In the trial court, the State relied upon only one exception to the warrant requirement: consent to search. Because the State was required to justify the warrantless search, we limit our discussion to this ground.

*Id.* Where a trial court does not enter any findings of fact, we must view the evidence " 'in the light most favorable to the trial court's ruling' " and " 'assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record.' " *Id.* (quoting *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim.App.2000)). "[W]hether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent are mixed questions of law and fact which reviewing courts should examine *de novo.*" *Hubert v. State,* 312 S.W.3d 554, 559–60 (Tex.Crim.App.2010).

### III. A.S.'s CONSENT TO ENTER THE RESIDENCE

■ The Fourth Amendment to the United States Constitution provides:

[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Article I, section 9 of the Texas Constitution further provides that:

[t]he people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9. A search without a warrant is presumed to be unreasonable, but there are exceptions to the warrant requirement. *See Wiede v. State,* 214

S.W.3d 17, 24 (Tex.Crim.App.2007) (citing *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999)). One exception is consent to search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex. Crim.App.2002).

■ Consent to enter and search property can be given either by the individual whose property is searched or by a third party who possesses common authority over the premises. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Patrick v. State,* 906 S.W.2d 481, 490 (Tex.Crim.App.1995). "Common authority" is "mutual use of the property by persons generally having joint access or control for most purposes." *Patrick,* 906 S.W.2d at 490. "Although property interests are relevant to this determination, the commonality of authority to consent is not determined solely by the law of property." *Hubert,* 312 S.W.3d at 560. Rather, we look to whether it is "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 560–61. The State bears the burden of proving actual authority by presenting facts that show mutual use of and control over the property by the third person. *Id.* at 560–62.

■ When the facts do not support a finding of actual authority, a search may be valid if the consent-giver is clothed with apparent authority. *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793. A law enforcement officer's warrantless search of a person's premises may be justified under the doctrine of "apparent authority" when consent to search is obtained from a third party whom the officers reasonably believe at the time of the search to possess common

authority over the premises, but who does not, in fact, possess such authority. *Id.* at 186–89, 110 S.Ct. 2793. A third party's consent is valid if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 188, 110 S.Ct. 2793. The State has the burden to prove apparent authority, *id.* at 181, 110 S.Ct. 2793, and this burden is not met if, when faced with an ambiguous situation, the officer nevertheless proceeds without making any further inquiry. *Id.* at 186–89, 110 S.Ct. 2793. If the officers do not learn enough and if the circumstances fail to clarify whether the property is subject to common authority by the consent-giver, then the warrantless search is unlawful. *Id.*

██ It is undisputed that A.S. was Limon, Sr.'s nephew and Limon's cousin. The testimony presented by the State at the suppression hearing does not provide any information regarding whether A.S. lived at the Limon residence or was just visiting. Officer Perez testified that he did not inquire as to A.S.'s use of or control over the property. Based on this lack of evidence, it is clear that the State failed to demonstrate that A.S. had actual authority to consent to the officers' entry into the home. *Cf. Hubert,* 312 S.W.3d at 562–65 (holding that the evidence was sufficient to justify an implied finding that the defendant's grandfather was the exclusive owner of the home and validly consented to a search of the defendant's bedroom). Moreover, consent to enter a home is different than consent to search the premises, and there was no evidence presented that A.S. had actual authority to allow the officers to proceed to Limon's bedroom for a search of the room. *See Alberti v. State,* 495 S.W.2d 236, 237 (Tex.Crim.App.1973) ("[A]n invitation to officers to enter a residence ordinarily cannot be construed as an invitation or consent to search."). Thus, the warrantless entry can only be sustained if the facts available would warrant a person of reasonable caution in the belief that A.S. had authority over the premises under the doctrine of apparent authority.

Officer Perez testified at the suppression hearing that he knew that A.S. was not an adult, that he believed A.S. was thirteen or fourteen years old, and knew that the house belonged to Limon, Sr., an adult. Officer Perez admitted that he did not ask A.S. if he lived at the house, if he had possession or control of the house, how old he was, or what grade he attended at school. Rather, he told A.S. he was a police officer there to investigate a shooting and then asked for permission to enter. The dissent would conclude that because A.S. opened the front door of the home at 2:00 a.m., Officer Perez reasonably concluded that A.S. was a resident of the house.[3] But this logic is flawed for several reasons.

██ First, mere presence at a residence is insufficient to support a reasonable belief that the person has authority to consent to a search. The State must present more evidence than mere presence to support a finding of apparent authority. *See, e.g., United States v. Cos,* 498 F.3d 1115, 1129 (10th Cir.2007); *Riordan v. State,* 905 S.W.2d 765, 772 (Tex.App.-Austin 1995, no pet.) (holding that mere presence and relationship to defendant does not justify conclusion that person has apparent authority). A.S.'s mere act of answering the door in the middle of the night

---

**3.** The State did not file a brief in this case; thus, we are without the benefit of any argument on its behalf.

did not, by itself, justify Officer Perez's conclusion that A.S. had authority to consent to entry into the home, and more specifically, into Limon's bedroom, particularly given that Officer Perez knew that an adult owned and resided on the premises.

■ Second, a child is generally incapable of waiving his own rights without any instruction or guidance, and is even less fit to surrender the rights of another. *See Reynolds v. State*, 781 S.W.2d 351, 355 (Tex.App.-Houston [1st Dist.] 1989, pet. ref'd) (holding that consent given by the defendant's twelve-year-old son was not effective). More importantly, however, a child who may have been awakened from his or her slumber at 2:00 a.m. is unlikely to be thinking clearly or capable of making a reasoned decision whether to admit officers into the home. *See* Matt McCaughey, *And a Child Shall Lead Them: The Validity of Children's Consent to Warrantless Searches of the Family Home*, 34 U. LOUISVILLE J. FAM. L. 747, 749 (1996) ("[C]hildren are far less likely to understand the consequences of their consent, and thus, some may not have the capacity to consent voluntarily to a warrantless search."). Officer Perez did not testify that he advised A.S. of the consequences of his consent to search or that A.S. understood those consequences and made a reasoned decision.

These circumstances created an ambiguity that Officer Perez was obligated to resolve before entering the home, requiring him to ask further questions, such as whether the child actually lived at the home, whether the child's parents were available, whether the child understood that he did not have to consent, or whether the child wished to consult an adult on the premises. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (holding knowledge of the right to refuse consent is one factor to be taken into account in the totality of circumstances); *see Riordan*, 905 S.W.2d at 772 (holding that officer could not rely on cursory conversation to establish apparent authority). Had Officer Perez simply asked A.S.'s name, he would have realized that A.S. did not share the same last name as Limon, Sr. Upon that discovery, Officer Perez should have asked to speak to Limon, Sr., instead of relying on a thirteen- or fourteen-year-old's consent to enter. The State did not meet its burden to present evidence demonstrating a reasonable belief that A.S. had authority to allow the officers to enter.[4]

The dissent cites *Russell v. State*, concluding that permission to search a residence given by a minor has been held to be sufficient. 739 S.W.2d 923, 928 (Tex. App.-Dallas 1987, pet. dism'd w.o.j.). The facts of that case, however, are readily distinguishable. In that case, Russell was a sixteen-year-old girl who was being investigated for murder. *Id.* at 925–26. Russell spoke to the police on her front

---

4. The dissent claims that we are creating a "new rule of law for police to follow when conducting searches" because we are requiring officers to ask minors certain questions to make sure the minor has authority to permit entry. *See Limon v. State*, 314 S.W.3d 694, —— (Tex.App.-Corpus Christi, 2010, no pet. h.) (Vela, J., dissenting). Not so. Rather, we are enforcing the well-established rule that an officer may not proceed in an ambiguous situation without first verifying that the person purporting to consent to the entry has authority to do so. *Illinois v. Rodriguez*, 497 U.S. 177, 186–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Here, an ambiguity existed not just because A.S. was a minor, but also because Officer Perez knew that Limon, Sr. owned the house and it was 2:00 a.m. When a child answers the door at 2:00 a.m., and the officer knows who owns the home, it is not unreasonable to require an officer to determine if the child lives in the home, and if not, ask to speak to the owner, which Officer Perez did not do.

doorstep and agreed to go with them to the police station to give a statement. *Id.* At the police station, Russell informed the police that she was on adult felony probation and told the officers that she was eighteen years of age instead of providing her true age of sixteen. *Id.* According to the court of appeals' recitation of facts, the officers had no reason to disbelieve Russell when she told them her age, as she appeared mature. *Id.* at 926.

The next day, Russell returned to the police station for a polygraph test, and after the test, the officers asked for her consent to search her residence. *Id.* The officer explained to Russell that she could refuse consent and that she was under investigation for murder. *Id.* Russell signed the consent. *Id.* The search of her residence uncovered evidence connecting her to the alleged murder. *Id.* Russell moved to suppress the evidence at her trial, claiming that her consent was not voluntary because she was a minor. *Id.* The court disagreed, explaining as follows:

> The fact that Russell was only 16 years old does not preclude a finding that her consent and confessions were voluntary. Russell said she was 18 years old and acted like it. She was no stranger to the criminal justice system, on adult felony probation with another felony charge pending. Having cut a neighbor's telephone wires in anger and then beaten an old woman to death with a hammer, Russell was not the sort of person one would expect to be easily intimidated, even by police.

*Id.* at 928.

*Russell* is distinguishable because that case did not concern a child's apparent authority to search a residence, but rather, involved the voluntariness of a minor's consent. *Id.* There are no facts in *Russell* indicating suggesting that another person controlled the property that was searched.

*Id.* Second, *Russell* involved a sixteen-year-old girl who lied to police and told them she was an adult, and there was no reason to doubt the veracity of her story. *Id.* Finally, and most importantly, *Russell,* while probably reaching the correct result, was poorly reasoned, as pointed out by the dissent in that case, and appears to state that the voluntariness of consent turns on whether the person is of a savory character. *Id.* at 929–30 (Whitham, J., dissenting). Thus, we find *Russell* inapposite and hold that the State did not present evidence to justify the warrantless entry into the home based on the apparent authority of A.S.

## IV. Application of the Exclusionary Rule

At the suppression hearing, the State argued that the evidence obtained at the residence could be admitted at trial because after the entry into the home, Limon's parents consented to a search of the residence. Limon argues that his parents' consent to search the home was tainted by the illegal entry into the home; therefore, all the evidence discovered pursuant to the consent should be excluded. Limon further argues that his statement given to police after his arrest, which was based on the illegally-obtained evidence, was tainted by the police conduct and should have been excluded. We agree.

### A. The Limons' Consent to Search

 As the Supreme Court has explained,

> [t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial,

that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

*Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). To determine whether consent to a search, following the police's illegal entry onto premises, is tainted by the illegal entry, we must look to the following factors:

> (1) the temporal proximity between the unlawful entry and the given consent; (2) whether the warrantless entry brought about police observation of the particular object for which consent was sought; (3) whether the entry resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent, and (6) whether the police purpose underlying the illegality was to obtain the consent.

*Stone v. State,* 279 S.W.3d 688, 693 (Tex. App.-Amarillo 2006, pet. ref'd) (adapting the factors set forth in *Brick v. State,* 738 S.W.2d 676 (Tex.Crim.App.1987), to an unlawful entry followed by consent to search).

First, the consent occurred shortly after the police entered the Limon home and swept the home for weapons. This factor weighs in favor of exclusion of the evidence. *Id.*

Next, Officer Perez testified that he was investigating the shooting and did not have probable cause to arrest Limon at the time he arrived at the home. Officer Perez was looking for evidence relating to the shootings, and the illegal entry into the home allowed him to view guns in the southwest bedroom, providing him with further suspicion that Limon was involved.[5] The subsequent consent to search the rest of the home further revealed ammunition in that bedroom. Accordingly, this factor supports exclusion of the evidence. *Id.*

Third, there was flagrant misconduct in this case. Officer Perez obtained information from an unidentified person that the "Limon kids" were involved in the shootings. In fact, he admitted that at the time he arrived at the Limon house, he had a reasonable suspicion that a suspect was in the house, but he did not have probable cause. He testified that he went to the Limon residence to "investigate" at 2:00 a.m. Upon encountering A.S. at the door, Officer Perez made absolutely no inquiry as to A.S.'s authority to consent to his entry, and he and the other officers immediately proceeded to the back bedroom of the house, where Limon was sleeping. Limon and the two other males in the bedroom were handcuffed and moved to the common area of the house. Limon's parents, who Officer Perez had no reason to suspect as being involved in the shootings, were awakened from their sleep in the middle of the night. Limon, Sr. was handcuffed and made to lie face-down on the

---

**5.** Although Officer Perez testified that another officer outside a window to the southwest bedroom pointed out the guns to Officer Perez, the State did not attempt to justify the admission of the handguns into evidence based on the other officer's ability to view them from outside the residence. In fact, the evidence showed that the area outside the southwest bedroom was enclosed in a privacy fence, and the State did not offer any testimo-

ny showing that the officers could have viewed the handguns from outside the privacy fence. Thus, the State did not show that the area was not curtilage that is protected by the Fourth Amendment. *See Pool v. State,* 157 S.W.3d 36, 41 (Tex.App.-Waco 2004, no pet.). Accordingly, the officers would not have been able to search the yard without either a warrant or consent.

floor—naked. *See Green v. State,* 615 S.W.2d 700, 708 (Tex.Crim.App.1980) (holding police misconduct was flagrant where the defendant was awakened from his sleep and arrested in the middle of the night at gunpoint and without clothing). Although Limon, Sr., was allowed to get dressed and his handcuffs were removed before the officers asked for consent, there was no significant time lapse between these events. Under these circumstances, this factor weighs in favor of excluding the evidence. *See Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (holding that the manner of arrest indicated it was "calculated to cause surprise, fright, and confusion," where the arrest was based on an anonymous tip, and the defendant was ambushed by police officers at gunpoint on his way home); *see also Bell v. State,* 724 S.W.2d 780, 790 (Tex.Crim.App.1986) (listing cases where flagrant misconduct was found).

Fourth, the consent was not volunteered, but was requested, which favors exclusion of the evidence. Fifth, the Limons were made aware of the right to refuse consent, which favors admitting the evidence. Finally, the State did not present any evidence on whether the police purpose underlying the illegality was to obtain the consent, but as stated above, the police misconduct justified such a conclusion. *See Brown,* 422 U.S. at 605, 95 S.Ct. 2254. When taking these factors together, it is clear that the State failed to meet its burden to prove that the taint from the illegal entry had sufficiently dissipated before the consent was given. *See Brick,* 738 S.W.2d at 681 (holding that the burden is on the State). Accordingly, all of the evidence discovered at the residence should have been excluded.

**B. Limon's Statement**

■ Next, Limon argues that because all of the evidence discovered at the house was illegally obtained, and Officer Perez did not have a warrant for his arrest, his arrest was illegal, and therefore, the statement he gave to the police while in custody should be excluded. Officer Perez admitted that at the time he sought permission to enter the Limon residence, he did not have probable cause to arrest Limon and he did not have a warrant. Officer Perez testified that after the search of the residence, which we have held was illegal, he believed he had probable cause to arrest Limon and took him to the police station. Shortly after his arrival, Limon gave a statement to police that was relied upon to obtain his conviction.

■ Here, Limon's arrest was illegal because it was without a warrant, and the information necessary to establish probable cause was the result of the illegal entry and search of the home. *Sturchio v. State,* 136 S.W.3d 21, 25 (Tex.App.-San Antonio 2002, no pet.) ("Because the warrantless arrest and search incident to arrest that led to the discovery of the cocaine were based on the illegal seizure of the crack pipe, they were illegal as well. Consequently, the evidence obtained as a result of the pat down, warrantless arrest, and search incident to arrest should have been suppressed."). To determine whether a defendant's statement, given after an illegal arrest, was attenuated from the illegality, we must look at (1) the giving of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official conduct. *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254; *Bell,* 724 S.W.2d at 788.

First, it is undisputed that Limon received *Miranda* warnings before giving his statement. This fact, however, does not carry much weight in the analysis. *Bell,* 724 S.W.2d at 788. "[E]ven repeated

warnings alone are not enough to purge the taint of an otherwise illegal arrest." *Id.* Second, the statement was given shortly after Limon's arrest. Officer Perez testified that it took an hour from the time of Limon's arrest to transfer him to the police station and book him, and Limon was in jail for thirty minutes before Officer Perez read him his *Miranda* rights and obtained the statement. *See id.* at 788–89 & n. 4 (holding that a time span of one to three hours is considered "close temporal proximity"). Third, according to Officer Perez, there were no intervening circumstances. Officer Perez denied having any conversations with Limon, nor did Limon have any significant time to reflect or consult with anyone prior to his statement. *Id.* at 788–89. Finally, our analysis of the purpose and flagrancy of the police conduct is the same as our analysis of the taint resulting from the improper entry of the home. *Id.* at 789–90. Accordingly, Limon's statement was not attenuated from the taint of the illegal entry and search of the residence, and should have been excluded.[6]

## V. HARMFUL ERROR

Limon argued below and argues to this Court that the evidence in this case was obtained and admitted at trial in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. *See* U.S. CONST. amend. IV, XIV. Because the error below was constitutional, we apply the harmless error analysis under Texas Rule of Appellate Procedure 44.2(a). *See Hernandez v. State,* 60 S.W.3d 106, 108 (Tex.Crim.App.2001). Rule 44.2(a) provides that "[i]f the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX.R.APP. P. 44.2(a). While this rule does not explicitly place the burden on the State to show harmless error, "the 'default' is to reverse unless harmlessness is shown. Thus, if neither party does anything, the case will be reversed. This requires the State to

---

**6.** The dissent would refuse to consider Limon's final argument, characterizing Limon's challenge to the statement as being based on the illegal search of the vehicle, not the residence. The dissent concludes that the evidence does not show that Officer Perez coerced Limon into consenting to the vehicle search, and that Limon did not object to the admission of his statement on the basis that a written consent to search the vehicle was not admitted at trial.

The brief should not be so narrowly construed. The dissent picks out one isolated statement from the brief and presents it as if it constitutes the entirety of Limon's argument. The argument portion of the brief is not divided into distinct sections. Rather, the argument attacks each police action in chronological order, spending significant time discussing all aspects of the initial entry into the home, the protective sweep, and the consent to search the home. The brief then mentions the search of the car in a brief sentence set off

as a separate paragraph—most likely because the search of the vehicle did not reveal any relevant, damaging evidence, but rather, revealed ammunition from an unknown caliber weapon that was never tied to the crime at issue. In the next paragraph, the brief launches into a discussion of the exclusionary rule, initially stating that "[Limon's] statement was obtained after his warrantless arrest based on this warrantless search."

Rather than narrowly reading this sentence of the brief to invoke a waiver of rights, as the dissent does, we read the brief as a whole and construe the statement to refer to the brief's prior discussion of the warrantless search of the residence. We hold that Limon did not waive his argument at trial because he obtained a ruling outside the presence of the jury, *see* TEX.R. EVID. 103, and he did, in fact, reassert his objection to the admission of the statement based on the prior warrantless search of the residence.

come forward with reasons why the appellate court should find the error harmless." *Merritt v. State*, 982 S.W.2d 634, 637 (Tex. App.-Houston [1st Dist.] 1998, no pet.) (citing *Arnold v. State*, 786 S.W.2d 295, 298 (Tex.Crim.App.1990) (placing the burden on the State to show harmless error under former rule 81(b)(2), the predecessor to rule 44.2(a)); *see also Davis v. State*, 195 S.W.3d 311, 317 (Tex.App.-Houston [14th Dist.] 2006, no pet.). The State has not filed a brief in this case and has provided us with no argument or any reason why the constitutional error in this case was harmless beyond a reasonable doubt. Accordingly, we reverse and remand for a new trial.

## VI. CONCLUSION

For all the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings.

Dissenting Opinion by Justice ROSE VELA.

Dissenting Opinion by Justice VELA.

In this case of first impression, the majority holds that before police may gain warrantless entry into a home via third-party consent from a minor who is a close relative of the home owner, the officer must ask the minor certain questions to make sure the minor has authority to permit entry. Op. at 702–03. Neither the United States Supreme Court nor the Texas Court of Criminal Appeals has required law enforcement to follow this procedure. In *United States v. Matlock*, the Supreme Court explained:

> The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinement, but rests rather on *mutual use of the property* by persons generally having joint access or control for most purposes, so that it is reason-able to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (citations omitted) (emphasis added). In line with *Matlock*, the court of criminal appeals has stated:

> [I]n order for a third person to validly consent to a search, that person must have equal control and equal use of the property searched. And we have recently emphasized that the third party's legal property interest is not dispositive in determining whether he has the authority to consent to a search, saying that "common authority derives from the *mutual use of the property*, not the ownership or lack thereof."

*Welch v. State*, 93 S.W.3d 50, 53 (Tex. Crim.App.2002) (footnotes omitted) (emphasis added). Neither *Matlock* nor *Welch* drew a distinction between minors and adults. Furthermore, the facts of this case simply do not warrant the creation of a new rule of law for police to follow when conducting such searches in this Court's jurisdiction. Because I conclude the majority has created an inflexible requirement that law enforcement must follow and has erred in failing to give proper deference to the trial court's determinations, I would hold that the trial court did not abuse its discretion in denying the motion to suppress.

### Standard of Review

Courts apply a bifurcated standard when reviewing a motion to suppress evidence. *St. George v. State*, 237 S.W.3d 720, 725 (Tex.Crim.App.2007). We review de novo the trial court's application of law to the facts, but we defer to the trial court on determinations of credibility and histor-

ical fact. *Id.; Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Whether consent was given voluntarily under the Fourth Amendment to the United States Constitution is a fact question that is given deference. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). "[W]hether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent are mixed questions of law and fact which reviewing courts should examine de novo." *Hubert v. State*, 312 S.W.3d 554, 589–60 (Tex.Crim.App.2010). When, as in this case, "a trial court does not enter findings of fact, a reviewing court must view the evidence in a light most favorable to the trial court's rulings and assume that the trial court resolved any issues of historical fact or credibility consistently with its ultimate ruling." *Id.* We review a ruling on a motion to suppress evidence for abuse of discretion and view the facts in the light most favorable to the trial court's decision. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex.Crim.App.2008). We will sustain the trial court's ruling if the ruling "is reasonably supported by the record and is correct on any theory of law applicable to the case." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Crim.App.2006).

### Third–Party Consent

The Fourth Amendment provides protection from "unreasonable" searches and seizures by government officials. U.S. CONST. amend. IV. Generally, searches performed without a warrant are unreasonable. *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *Wiede v. State*, 214 S.W.3d 17, 24 (Tex.Crim.App.2007). An exception to the general rule arises when someone voluntarily consents to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct.

2041, 36 L.Ed.2d 854 (1973); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex.Crim.App. 2002). Whether it is reasonable under the Fourth Amendment for an officer to rely on consent is a question that is determined by examining the totality of the circumstances. *Maxwell*, 73 S.W.3d at 281 (citing *Robinette*, 519 U.S. at 40, 117 S.Ct. 417).

"A third party can consent to a search to the detriment of another's privacy interest if the third party has actual authority over the place or thing to be searched." *Hubert*, 312 S.W.3d at 560. In other words, the third party may, in his own right, give valid consent when he and the absent, nonconsenting person share common authority over the premises or property. *Matlock*, 415 U.S. at 170, 94 S.Ct. 988; *Becknell v. State*, 720 S.W.2d 526, 528 (Tex.Crim.App. 1986). Even though property interests are relevant to this determination, we do not determine the commonality of authority to consent solely by the law of property. *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988; *Maxwell*, 73 S.W.3d at 281. Rather, a party shows common authority by

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Hubert*, 312 S.W.3d at 560–61 (citing *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988). "A defendant who has thus assumed the risk that another may permit a search of their shared property or premises may not complain of that search under the Fourth Amendment." *Id.*

The State bears the burden to show that a person who consented to a search either had actual or apparent authority to con-

sent. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Malone v. State*, 163 S.W.3d 785, 797–98 (Tex.App.-Texarkana 2005, pet. ref'd). "To meet its burden, the State must provide evidence that a third party either had mutual access to and control over the place that was searched, or that the officers conducting the search reasonably believed facts provided to them by a third party that would have been legally sufficient to justify a search as reasonable." *Hubert*, 312 S.W.3d at 561–62. Under the Fourth Amendment, the State must show by a preponderance of the evidence that it was reasonable for an officer to proceed on the information available to the officer. *Maxwell*, 73 S.W.3d at 281.

### Analysis

The trial court, in denying appellant's suppression motion, made implied findings of fact that Officer Perez's testimony was credible and the facts were as he testified. *State v. Ross*, 32 S.W.3d 853, 856 n. 22 (Tex.Crim.App.2000). Likewise, this Court also accepts as true and credible Officer Perez's testimony at the suppression hearing. *Hubert*, 312 S.W.3d at 560–62.

### Actual Authority

On the basis of the testimony elicited during the suppression hearing, the trial court could have found: (1) that Mr. and Mrs. Limon owned the home that the officers searched; (2) that Officer Perez had reasonable suspicion to believe that the Limon kids were inside the Limons' residence; (3) that Officer Perez knocked on the Limons' front door in the early morning following the drive-by shootings; (4) that Mr. Limon's thirteen- or fourteen-year-old nephew, A.S., opened the front door; (5) that Officer Perez asked A.S. for permission to enter the house because he was investigating a drive-by shooting; (6)

that neither Officer Perez nor any other officer threatened or deceived A.S. in order to gain entry into the home; (7) that A.S. permitted the officers to enter the home; and (8) that despite A.S.'s minority status, Officer Perez was able to communicate with A.S., and he had the capacity to understand why Officer Perez wanted to enter the home. The record contains no evidence to show that A.S. was either asleep or under the influence of any substance prior to the time he opened the front door. After examining the totality of the circumstances, I would hold that the State presented evidence supporting an implied finding that the third party, A.S., voluntarily consented to the officers' entry into the home. *See Hubert*, 312 S.W.3d at 559 (stating that "[w]hether consent was given voluntarily under the Fourth Amendment is a fact question to be given deference.").

A.S.'s minority status does not automatically mean he could not have voluntarily consented to the entry of the home. *See, e.g., Russell v. State*, 739 S.W.2d 923, 928 (Tex.App.-Dallas 1987, pet. dism'd w.o.j.). I would also conclude, after examining the totality of the circumstances, that the State presented evidence supporting an implied finding that A.S. had joint access to or control over the premises and that Officer Perez reasonably believed that A.S. had the right to permit entry. *See Fancher v. State*, 659 S.W.2d 836, 839 (Tex.Crim. App.1983) (explaining that "[i]t is well established in Texas that third parties have authority to consent to a search when they have equal control over and equal use of the premises being searched.").

In *Hubert*, the court of criminal appeals stated that "under the common authority test, where the defendant lives with a parent or other close relative, and the relative consents to a search of defendant's bedroom, most courts presume that the rela-

tive has sufficient common authority over the bedroom to authorize the consent to search." *Id.,* 312 S.W.3d at 563 (internal quotes omitted). Even though appellant could have overcome this presumption by presenting evidence that he had exclusive possession of the searched premises,[1] the evidence elicited at the suppression hearing showed that the door to the bedroom in which Officer Perez found appellant was open, and the bedroom light was turned on. I would hold that, on the facts as the trial court was entitled to view them, A.S. had actual authority to consent to the entry into the home. *See id.*

### Apparent Authority

Even if A.S. did not have actual authority to consent to the entry, the entry is reasonable under the "apparent authority" doctrine. *See Hubert,* 312 S.W.3d at 561 (stating that "[a]ctual authority is not necessarily a prerequisite for a valid consensual search...."). The United States Supreme Court has explained that when an officer reasonably, though erroneously, believed that a third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists, and the purported consent from the third party can serve to make the search reasonable. *Rodriguez,* 497 U.S. at 186, 110 S.Ct. 2793. In other words, "[e]ven if the third party lacks actual authority to consent—that is, he does not actually have joint access to or control over the premises—his purported consent can nevertheless validate a search if it reasonably appears to the police that he does in fact have authority." *Hubert,* 312 S.W.3d at 561.

Here, the State presented evidence supporting an implied finding that Officer Perez did, in fact, act as would a person of reasonable caution. An officer might reasonably believe that a person who, in the early morning, opens the front door of a home in response to a knock, is a resident of the house and has "mutual use of the property." *See Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988; *Welch,* 93 S.W.3d at 53. In this case, the person who opened the front door was Mr. Limon's nephew. Officer Perez could have, therefore, made a good-faith reasonable inference that A.S. could validly give him and Officer Hernandez consent to enter the home. I would hold that Officer Perez acted in good faith and made a reasonable inference based on the facts of the situation. Based upon the totality of the circumstances, the evidence supported an implied finding that Officer Perez reasonably believed that A.S. had common authority over the premises and, therefore, had apparent authority to consent to the entry into the home. Accordingly, the trial court did not abuse its discretion in denying the motion to suppress based on the initial consent to enter the home.

Because an invitation to officers to enter a residence ordinarily cannot be construed as an invitation or consent to search,[2] I address whether Officers Perez and Hernandez could proceed to the southwest bedroom. A " 'protective sweep' is a 'quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.' " *State v. Sheppard,* 271 S.W.3d 281, 290 n. 30 (Tex.Crim.App.2008) (quoting *Maryland v. Buie,* 494 U.S. 325, 327–28, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based

---

1. *Hubert v. State,* 312 S.W.3d 554, 562–64 (Tex.Crim.App.2010).

2. *Alberti v. State,* 495 S.W.2d 236, 237 (Tex. Crim.App.1973) (op. on reh'g).

on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337, 110 S.Ct. 1093 (quoted in *Reasor v. State*, 12 S.W.3d 813, 816 (Tex.Crim.App.2000)). The protective sweep "is permitted only when 'justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.' " *Reasor*, 12 S.W.3d at 816 (quoting *Buie*, 494 U.S. at 336, 110 S.Ct. 1093).

Based upon what Officer Perez was told about the shootings, when considered with the presence of the green, four-door car outside the Limon residence, he had reason to believe that suspects were in the house with weapons. This evidence supported an implied finding of specific and articulable facts of a danger to the officers, sufficient to enable Officers Perez and Hernandez to move forward inside the Limon residence to a bedroom under the auspices of a protective sweep.

Even assuming the entry and protective sweep were unlawful, if the State showed by clear and convincing evidence that Mr. and Mrs. Limon's consent was sufficiently attenuated from any illegal entry and sweep, the evidence found in the search is admissible. *See Reasor*, 12 S.W.3d at 819. When consent to search follows an illegal entry onto property, we analyze the consent, using the factors set out in *Brick v. State*, 738 S.W.2d 676 (Tex.Crim.App. 1987), to determine whether it was tainted by illegal police conduct. *See Beaver v. State*, 106 S.W.3d 243, 250 (Tex.App.-

Houston [1st Dist.] 2003, pet. ref'd). The *Brick* factors include:

> the proximity of the consent to the arrest, whether the seizure brought about police observation of the particular object which they sought consent to search, whether the illegal seizure was flagrant police misconduct, whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, and whether the police purpose underlying the illegality was to obtain the consent.

*Brick*, 738 S.W.2d at 680–81.

With respect to whether Mr. and Mrs. Limons' written consent to search their home was voluntary, the evidence showed that when the officers secured the home for weapons, they made Mr. Limon lie on his bedroom floor and they handcuffed him. His wife was handcuffed and taken to a common area of the house where she was seated. Officer Perez allowed Mr. Limon to stand, removed the handcuffs, and allowed him to get dressed. After removing the handcuffs, Officer Perez asked him for consent to search the house. Mr. Limon told him to talk to his wife. Mrs. Limon's handcuffs were removed, and Officer Perez took Mr. and Mrs. Limon into the kitchen. There, he explained the situation to them and read them the consent-to-search form. This form made them aware of their right to refuse consent to a search of their home.[3] Mr. and Mrs. Limon gave him consent to search their

---

**3.** The consent-to-search form stated, in relevant part:

> I, *Dennis Limon/Beatrice Limon* having been informed by the hereafter named Texas Peace Officer, that I have a constitutional right to be free from having him or other officers make a warrantless search of the

> hereafter mentioned premises under my control and also a constitutional right to refuse to give him or any other officer consent to make such a search and that such rights are guaranteed to me both by the Texas and U.S. Constitutions, do hereby voluntarily waive those rights. . . .

home, and both of them signed the form.[4] Officer Perez testified that they were not under arrest and were not wearing handcuffs when they consented to the search. Reviewing the totality of the circumstances,[5] I would hold that the evidence supports an implied finding by clear and convincing evidence that Mr. and Mrs. Limon's consent to search their home was free and voluntary and not the result of duress or coercion. *See Gutierrez v. State,* 221 S.W.3d 680, 686 (Tex.Crim.App.2007) (stating that "[t]he validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily" and "was not the result of duress or coercion.").

Applying the remaining *Brick* factors, Mr. and Mrs. Limon consented to the search shortly after police swept the home for weapons. Finding the weapons in plain view in the southwest bedroom may have encouraged the police to request to search the entire home, but they did not search the entire home until after receiving written consent to search. The police conduct was not flagrant. Officer Perez had information that the Limon kids were involved in one of the shootings and that a green, four-door car was seen leaving the area of the other shooting. When he arrived at the Limon residence, a green, four-door car was parked out front. It had a warm hood and a bullet hole in the front-passenger door. The police did not force their way into the house to investigate the shootings; rather, Officer Perez told A.S. he was investigating a shooting and obtained his consent to enter. Mr. and Mrs. Limon were made fully aware of the fact that they could decline to consent to a search of their home and thus prevent an immediate search.

I conclude that even if the officers unlawfully entered and swept the home, the evidence supports an implied finding that Mr. and Mrs. Limon's consent to search their home was sufficiently attenuated from any illegality. *See Reasor,* 12 S.W.3d at 819. Accordingly, the trial court did not err in denying the motion to suppress on the basis of any unlawful entry and protective sweep. I hold the trial court did not abuse its discretion by denying the motion to suppress on this basis.

I would overrule the issue and affirm the trial court's judgment. For these reasons, I respectfully dissent.

---

4. The consent-to-search form was admitted into evidence at the suppression hearing as State's exhibit 1. It was admitted into evidence at the trial on guilt/innocence as State's exhibit 78.

5. *See Gutierrez v. State,* 221 S.W.3d 680, 686–87 (Tex.Crim.App.2007) (stating that to determine whether the State met its burden, we look at the totality of the circumstances).