

NUMBER 13-08-00551-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**DENNIS WAYNE LIMON JR.,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                             **Appellee.**

### On appeal from the 36th District Court
### of San Patricio County, Texas.

# MEMORANDUM OPINION ON REMAND

**Before Chief Justice Valdez and Justices Benavides and Vela
Memorandum Opinion On Remand by Justice Benavides**

This case is before us on remand from the Texas Court of Criminal Appeals.
*See Limon v. State*, No. PD-1320-10, 2011 Tex. Crim. App. LEXIS 830 (Tex. Crim. App.
June 15, 2011). Appellant, Dennis Wayne Limon, Jr., was convicted of deadly conduct
with a firearm, a third-degree felony, and sentenced to three years' imprisonment in the

Texas Department of Criminal Justice—Institutional Division. *See* TEX. PENAL CODE ANN. § 22.05 (West 2003); *id.* § 12.34 (West Supp. 2010). By a single issue, Limon argues that the trial court erred by denying his motion to suppress illegally-obtained evidence. We affirm.

## I. BACKGROUND[1]

Limon was indicted for the offense of deadly conduct with a firearm and subsequently filed a "Motion to Determine the Admissibility of Illegally Obtained Evidence and Statements." At the hearing on the motion, Officer Gus Perez testified that on June 28, 2007, he received a call at about 10:00 p.m. informing him that there was a shooting in Aransas Pass at the 1400 block of W. Matlock. On his way to that location, Officer Perez was advised that another shooting had occurred. He proceeded to the location of the second shooting, at 244 N. 11th Street. At the scene of the second shooting, Officer Perez recovered three "shotgun waddings," which he described as projectiles from a shotgun. He spoke to a witness who advised Perez that he had seen a green four-door car leaving the area. Officer Perez then proceeded to the location of the first shooting. When he arrived, he was approached by a "person that live[d] in the vicinity who advised [him] that that person believed that the Limon kids were involved." Officer Perez testified that he knew of only one Limon family in Aransas Pass, and he knew where they lived. He went to the Limon residence, arriving at approximately 2:00 a.m., where he observed a green Buick four-door car. He felt the hood, which he stated was warm and observed what appeared to be a bullet hole in the

---

[1] Because the parties are familiar with the facts, we will not recite them in their entirety except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.1. For a full recitation of the facts surrounding this case, see our opinion in the original submission, *Limon v. State,* 314 S.W.3d 694 (Tex. App.—Corpus Christi 2010), *rev'd,* No. PD-1320-10, 2011 Tex. Crim. App. LEXIS 830 (Tex. Crim. App. June 15, 2011).

front passenger door. Officer Perez testified on cross-examination that the bullet hole indicated to him that someone had shot at the car. Officer Perez then called for backup, and three other officers arrived within minutes.

Officer Perez testified that he did not have a search warrant or an arrest warrant, and it would have taken him about an hour and a half to two hours to get one. Officer Perez went to the front door and knocked. The door was answered by A.S. Officer Perez testified that he knew that Limon's father (hereinafter "Limon, Sr."), an adult, lived in the residence. On direct examination during the pretrial hearing, Officer Perez testified that A.S. was a teenager, about thirteen or fourteen years old. Officer Perez asked A.S. if he could search the residence, to which A.S. agreed.

Officer Perez testified that while he was outside the home, he did not see any crimes visibly being committed inside or outside the home. He stated that when he arrived at the front door, he had a "reasonable suspicion that there was a suspect inside . . . . It was likely—I didn't know. It was approaching probable cause but more than a reasonable suspicion."

Officer Perez testified that, once in the home, "there was an odor of mari[h]uana coming from the residence itself." He stated that he and Officer Hernandez went to the bedroom in the southwest corner of the residence, where they observed Limon and two other males lying in bed, apparently sleeping with the lights on. The officers had their guns drawn, and they told Limon and the two males to get up. Limon was handcuffed and moved into the common area of the home.

Officer Perez stated that another officer, Officer Rhodes, was outside the residence looking through a window into the southwest bedroom, and he informed Officer Perez that he saw weapons in the room. Officer Perez stated that "[t]here was [sic] two handguns towards the front where their heads were to the west side of the bed at which point we went ahead and detained everybody in the residence, secured them all so we could secure those weapons and see if there was [sic] any other weapons."

After the initial "sweep" of the home, Mrs. Limon then gave written consent to search the home. After obtaining consent, Officer Perez photographed the residence, and he testified that ammunition for a .22 caliber gun and a 12-gauge shotgun were found in the southwest bedroom, along with drug paraphernalia. He stated that outside the residence, in the vicinity of the southwest bedroom, the officers located a "Remington semiautomatic shotgun 12 gauge." Officer Perez agreed that the shotgun was "near the window of the southwest bedroom" in an area enclosed by a privacy fence belonging to the Limon residence.

Officer Perez testified that at that time, he "felt that there was probable cause for the arrest," and he arrested Limon. Limon was transported to the police station and booked, which took approximately one hour. Limon was in the jail for about thirty minutes before he was given his Miranda warnings; following the warnings, at 5:01 a.m., he provided a statement.

The trial court denied Limon's motion to suppress without stating the grounds or issuing findings of fact and conclusions of law. The evidence obtained from the search of the residence, the later search of the car, and Limon's statement were admitted at trial, and Limon was convicted of deadly conduct by use of a firearm. *See id.*

4

§ 22.05(b)(2), (e).

## II. PROCEDURAL HISTORY

On the original submission in this case, a majority of this Court held that A.S., a minor, did not have apparent authority to admit the officers into the Limons' home, and we concluded that all of the evidence gathered in the home, in Limon's car, and Limon's subsequent statement derived from the officers' illegal entry, were "fruits of the poisonous tree," and should have been excluded from evidence at Limon's trial. *See Limon*, 314 S.W.3d 694, 704–09 (Tex. App.—Corpus Christi 2010). The court of criminal appeals granted the State's subsequent petition for discretionary review and reversed this Court's holding, noting:

> Under the facts available to Officer Perez at the moment, a mature teenager, possibly an adult, opened the front door to him at 2:00 a.m. and, after hearing that he was investigating a shooting, gave him consent to enter through the front door. We find that a person of reasonable caution could reasonably believe that A.S. had the authority to consent to mere entry under those circumstances.

*Limon*, 2011 Tex. Crim. App. LEXIS 830, at *11. The court of criminal appeals remanded the case to this Court "for proceedings not inconsistent with [its] opinion." *Id.* at *12.

## III. DISCUSSION

Because the court of criminal appeals determined that A.S. had apparent authority to consent to the police officers' entry into the home, our task on remand is to evaluate Limon's remaining contentions, beginning with the premise that the officers' were inside the home legally. In this evaluation, we rely on the court of criminal appeals's holding that

5

A.S. consented to mere entry through the front door, as opposed to entry or search of less public areas of the house. The trial court could have believed that it was reasonable to rely on a teenager's authority to consent to such a limited scope of entry, while it would not have been reasonable to rely on his authority to consent to a more intrusive search.

*Id.* at *9. Therefore, the relevant argument remaining for review is whether, upon entry, the officers legally searched beyond the common area of the house.

## A. Standard of Review

"[W]hen reviewing a trial court's decision to deny a motion to suppress, an appellate court 'should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor.'" *Montanez v. State*, 195 S.W.3d 101, 105 (Tex. Crim. App. 2006) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We afford the same deference to rulings applying law to fact questions, otherwise known as mixed questions of law and fact, "'if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.'" *Id.* (quoting *Guzman*, 955 S.W.2d at 89). "Finally, an appellate court may conduct a de novo review where the resolution of mixed questions of law and fact does not turn on an evaluation of credibility and demeanor." *Id.*

Where a trial court does not enter any findings of fact, we must view the evidence "'in the light most favorable to the trial court's ruling'" and "'assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record.'" *Id.* (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

**B. Analysis**

The officers in this case did not have a warrant to search the rooms of the Limons' house, nor did they have consent. *Id.* However, these facts do not automatically make the search illegal.

"In order for a warrantless search to be justified, the State must show the existence of probable cause at the time the search was made, and the existence of exigent circumstances which made the procuring of a warrant impracticable." *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991) (citing *Hooper v. State*, 516 S.W.2d 941, 944 (Tex. Crim. App. 1974)). "Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *Id.* (citing *Washington v. State*, 660 S.W.2d 533, 535 (Tex. Crim. App. 1983)). "Probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total." *Smith v. United States*, 358 F.2d 833, 837 (D.C. Circ. 1965). The U.S. Supreme Court has expressed the probable cause standard as follows:

> In dealing with probable cause, . . . as the very name implies, we are dealing with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 176 (1948); *see also McNairy*, 835 S.W.2d at 106; *Woodward v. State*, 668 S.W.2d 337, 340 (Tex. Crim. App. 1982) (op. on reh'g).

Here, once inside the home, Officer Perez smelled marihuana. His testimony was additionally supported by the fact that the officers did in fact find small amounts of marihuana and paraphernalia used to smoke marihuana in the house. It is well established that an officer may gain probable cause to search an area when a recognizable odor of an illegal substance is clearly emanating from that area. *See McNairy*, 835 S.W.2d at 106 (noting that the unmistakable odor of methamphetamine production was a valid element in establishing probable cause); *Longoria v. State*, 747 S.W.2d 50, 52 (Tex. App.—San Antonio 1988, pet. ref'd) (citing *Brown v. State*, 481 S.W.2d 106, 111–12 (Tex. Crim. App. 1972)) (noting that after consent was given to search the back of a vehicle, when the "appellant opened the back of the vehicle, the [officers] smelled the odor of marihuana," and that "[p]robable cause arose at that time for the officer to believe a crime had been or was being committed"). Here, the smell of marihuana emanating from Limon's home would "lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *See McNairy*, 835 S.W.2d at 106. Therefore, it would be reasonable for the trial court to find that, once admitted into the common area of Limon's house, the officers acquired probable cause to search the house based on the observance of the odor of marihuana. *See id.*; *Longoria*, 747 S.W.2d at 52.

Once we determine that probable cause existed for the search, "the inquiry becomes whether exigent circumstances existed to obviate the need for a search warrant." *McNairy*, 835 S.W.2d at 107 (citing *Hooper*, 516 S.W.2d at 944).

> A variety of such circumstances may place a police officer in situations in which a warrantless entry is viewed as a reasonable reaction by the officer. Situations creating exigent circumstances usually include factors pointing to some danger to the officer or victims, an increased likelihood of

8

apprehending a suspect, or the possible destruction of evidence.

*Id.* (citing *Stewart v. State*, 681 S.W.2d 774, 777 (Tex. App.—Houston [14th Dist.] 1984, pet. ref'd) (noting that exigent circumstances justifying a warrantless entry include "(1) rendering aid or assistance to persons whom the officers reasonably believe are in need of assistance; (2) preventing the destruction of evidence or contraband; and (3) protecting the officers from persons whom they reasonably believe to be present and armed and dangerous")).

Here, it was reasonable for the officers to believe that an immediate search was necessary to prevent the destruction of evidence and to increase the likelihood of apprehending a subject because, if they had left in order to obtain a warrant, the individuals in the house would certainly have been warned that the police had been to the door and would be coming back with a warrant. Additionally, because the officers arrived at the house based on a tip that individuals involved in an earlier shooting lived in the house, and because that tip was corroborated by a vehicle with a bullet hole in its door matching the description of one involved in the shooting, the officers were justified in searching the premises immediately in order to ensure their own safety. In other words, "this evidence supported an implied finding of specific and articulable facts of a danger to the officers, sufficient to enable Officers Perez and Hernandez to move forward inside the Limon residence to a bedroom under the auspices of a protective sweep." *See Limon*, 314 S.W.3d 694, 712 (Tex. App.—Corpus Christi 2010) (Vela, J. dissenting). Therefore, we conclude that exigent circumstances existed justifying the officers' failure to secure a search warrant. *See McNairy*, 835 S.W.2d at 107. Accordingly, the search conducted was legal. Limon's issue is overruled.

9

## IV. CONCLUSION

Having overruled Limon's only issue, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of August, 2011.