**Donna Renae RUSSELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05-83-00273-CR.**

Court of Appeals of Texas, Dallas.

Oct. 14, 1987.

Discretionary Review Granted Feb. 10, 1988.

---

Nancy Gail Huggins, Jan E. Hemphill, Dallas, for appellant.

Jeffrey B. Keck, Dallas, for appellee.

## ON REMAND FROM THE COURT OF CRIMINAL APPEALS

HECHT, Justice.

A jury found Donna Renae Russell guilty of murder and assessed punishment at 99 years' imprisonment.

On appeal, a panel of this court reversed Russell's conviction on the grounds that the district court erroneously admitted in evidence Russell's two confessions along with blood-splattered clothing found in a search of Russell's residence to which she consented, because her confessions and consent to search were all given while she was illegally detained. The panel rejected Russell's argument that her consent to search was invalid because it failed to comply with the Texas Family Code. *Russell v. State*, 672 S.W.2d 583 (Tex.App.—Dallas 1984), *rev'd*, 717 S.W.2d 7 (Tex.Crim.App. 1986) ("*Russell I*").

The court of criminal appeals reversed, holding that Russell's detention was not unlawful. The court of criminal appeals remanded the case to this court to determine whether Russell consented to the search of her residence voluntarily, and if not, whether her confessions were made in reaction to the illegal seizure of incriminating evidence. *Russell v. State*, 717 S.W. 2d 7 (Tex.Crim.App.1986) ("*Russell II*").

We hold that the State met its burden of proving by clear and convincing evidence that Russell gave her written consent to the search of her residence and two separate confessions voluntarily and of her own free will. We also hold that the search of Russell's residence did not exceed the

scope of her consent, and reaffirm the holding of the original panel that her consent is not invalid because it fails to comply with the Texas Family Code. We therefore conclude that the district court did not err in admitting evidence obtained from the search and the confessions. Finally, we conclude that Russell has waived other assertions of error by failing to object at trial. Accordingly, we affirm the judgment of the district court.

## I

At a hearing on a motion to suppress, whether a consent to search is freely and voluntarily given is a question of fact to be determined from the totality of circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Fancher v. State,* 659 S.W.2d 836, 839 (Tex.Crim.App.1983). The same is true of confessions. *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967); *McCoy v. State,* 713 S.W.2d 940, 955 (Tex.Crim.App.1986). The totality of circumstances in this case are as follows.

### A

Donna Renae Russell was upset and mad, upset because she had been up all night, and mad because none of her neighbors would give her a ride to her probation officer's office. She was so mad at one neighbor that she took some wire cutters and cut his telephone wires. Then she walked across the street from her house to the home of Margaret Neal. She went there, she said, to ask for a ride to meet with her felony probation officer, sometime before 10:00 a.m. on January 18, 1982.

Margaret Neal lived alone. She was a lady of medium build, maybe 5'6" tall, in her 70's, perhaps late 70's.

Russell knocked on Mrs. Neal's door. When no one answered, Russell pushed the door open and entered without invitation. Inside, she encountered Mrs. Neal, who asked her what she was doing breaking into her house. Russell answered that she wanted a ride to meet with her probation officer. A struggle ensued in Mrs. Neal's living room, apparently as Mrs. Neal attempted to escort Russell from her home.

Russell ran into Mrs. Neal's kitchen, and Mrs. Neal followed. Russell picked up a hammer and hit Mrs. Neal in the head with it. Mrs. Neal turned and ran back into the living room, where she fell. Russell pursued her into the living room and hit her in the head and face several more times with the hammer. Russell knocked out one of Mrs. Neal's teeth and broke virtually every bone in her head. Blood from Mrs. Neal's head, mouth and nose soaked the carpet and splattered the walls.

Mrs. Neal got up and fled down the hall. Again she fell. Again she managed to get to her feet and go into her bedroom. Still Russell came after her. In her bedroom Mrs. Neal began digging through her clothes, throwing them everywhere. Russell hit her in the head again and again, until at last, Mrs. Neal fell over a burning gas stove, dead from 6–12 hard blows to her head. Russell tossed a blanket over her, threw the hammer down, and ran out. As she left the room, she saw the blanket catch fire from the stove.

Russell ran out the back door of Mrs. Neal's home and back toward her house. Her neighbor was standing in his front yard, and Russell told him she had cut his telephone wires. Russell noticed that her clothes had blood on them, so she went inside her house and took them off.

Mrs. Neal's house began to burn. Firemen responding to the call discovered Mrs. Neal's body on the floor of her bedroom, charred beyond recognition. Suspicious, firemen summoned homicide investigators to the scene.

Officer Jerry King first saw Russell standing on the front porch of her house. When he approached her, she turned and went inside. He knocked on the door, and she answered. Officer Russell Graves came up, and he, King and Russell had a

conversation in front of Russell's house about the severed telephone wires and the death of Mrs. Neal. The officers asked Russell if she would accompany them to police headquarters, and she agreed. Russell was not arrested at that time.

Downtown, Graves and King gave Russell the required *Miranda* warnings. Russell said she understood her rights. The officers then discussed the severed telephone wires and Mrs. Neal's death with Russell for about an hour. Russell admitted cutting the telephone wires and signed a confession. She denied, however, that she had anything to do with Mrs. Neal's death. The officers asked Russell if she would return to police headquarters the next morning and take a polygraph test regarding Mrs. Neal's death. Russell agreed to do so, although she knew she didn't have to.

During this conversation with Russell at police headquarters, the officers learned that she was on adult felony probation and that she had another felony charge pending, credit card abuse. Russell said she was 18 and gave her date of birth as August 31, 1963. King and Graves had no reason to disbelieve Russell about her age. She appeared to have the maturity and understanding of an 18–year–old. In fact, however, she was 16.

Officer Graves drove Russell home the afternoon of January 18 and picked her up to take her downtown again the next morning, after 7:00 a.m. When they arrived at headquarters, Russell talked briefly with King, and then Graves took her to the polygraph examiner for her test. Sometime later the polygraph examiners told Graves that Russell had run out of the room, out of the building, and down Main Street. Graves told the examiners to go get her and bring her back. The main reason Graves had the examiners go get Russell was because she was hysterical and he was worried about her safety.

The polygraph examiners and Russell returned to police headquarters about 9:30 a.m. Russell was still hysterical, crying, obviously upset. Graves took her back to his office, got her a cold drink and some cigarettes, and let her calm down. Officer King joined them, and Graves again read the required *Miranda* warnings to Russell. Russell again said she understood them. She did not ask to speak with an attorney or terminate the interview. She said she wanted to talk and did not need an attorney.

Graves and King discussed Mrs. Neal's death with Russell and asked her to sign a written consent to search her residence. Before she signed it, King explained to Russell what her rights were, and that police would be looking for evidence to link her to the murder of Mrs. Neal. Russell said she understood her rights and signed the consent.

King left to search Russell's residence. There he found Russell's blood-splattered clothing. He took the clothing to the crime lab and waited there for a report. About 11:00 a.m.—12:00 m. he received the report and called Graves to tell him: there was human blood on Russell's clothing.

After King left, Graves continued to discuss Mrs. Neal's death with Russell. Russell was calm. Specifically, Graves testified:

Q. Before Donna talked to you around noon on Tuesday, the 19th, was she upset—

A. Yes; she was.

Q. —disturbed? Would you say she was very upset or crying or what?

A. Approximately 9:30 or 10:00 that morning she was crying.

Q. What about around noon?

A. When I first started talking to her, she was calm.

Q. Okay. And when was she not calm after noon?

A. After giving the first statement.

Q. After that?

A. Yes, ma'am.

Graves told Russell that he had no evidence against her and would tell her whenever he

obtained any. When King called Graves with the report from the crime lab, Graves immediately told Russell what they had found. At that point Russell confessed to the murder of Mrs. Neal. Graves took Russell's confession and had it typed, and Russell signed it at 12:20 p.m.

During her discussions with Graves after she returned to the police station Russell had been calm. After she confessed, she was no longer calm. However, she continued to talk. Graves again read her the required *Miranda* warnings, and she said she understood them and wanted to talk. She gave Graves a second statement, which he also had typed. Russell signed the second statement at 1:45 p.m.

Until Russell confessed, Graves did not know what the murder weapon was. On January 20 Graves returned to Mrs. Neal's home and there, right next to where Mrs. Neal's body had lain, he found the hammer.

Although Russell was upset when she ran from the polygraph room and later returned to police headquarters with the polygraph examiners, she never lost control of herself. Throughout her interviews with Graves and King she thought very straight.

### B

█ At a hearing on a motion to suppress, the State must prove the voluntariness of a consent to search by clear and convincing evidence. *Meeks v. State*, 692 S.W.2d 504 (Tex.Crim.App.1985). Likewise, the voluntariness of a confession must be shown with unmistakable clarity at a suppression hearing. *Sims v. Georgia*, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967).

> Also, since the trial court is the sole trier of the facts and the exclusive judge of the credibility of the witnesses and the weight to be given their testimony, our review of the trial court's determination is limited to whether an abuse of discretion occurred.

*McCoy v. State*, 713 S.W.2d at 955 (as to consent); *see Stephenson v. State*, 494 S.W.2d 900, 904 (Tex.Crim.App.1973) (as to confessions).

█ The evidence is overwhelming that Russell freely and voluntarily consented to the search of her residence and then confessed to the murder of Mrs. Neal. Russell went voluntarily to police headquarters twice. The first time, the day before she consented to the search of her residence and confessed to murder, she left knowing that the purpose of returning the next day was to be examined about Mrs. Neal's death. Still, she volunteered to return and was waiting the next morning for the officer to give her a ride downtown. Each time before officers conversed with her they warned her of her rights. Each time she said she understood her rights, wanted to talk, and did not need an attorney. Immediately before she signed the consent form, she was told that police would be looking specifically for evidence to link her to the murder of Mrs. Neal. She was told as soon as police discovered blood on her clothing found in her house, and she then confessed. Just before her second confession a few minutes later, she was again warned of her rights.

The fact that Russell left police headquarters and returned when polygraph examiners went after her does not preclude the finding that her subsequent consent and confessions were voluntary. Graves testified that the main reason he sent someone after Russell was that he was worried about her safety. He had, after all, driven her downtown. Nevertheless, in *Russell I* the panel of this court concluded that police coerced Russell into returning:

> [A] sixteen-year-old who is voluntarily in a police station, and not under arrest, ought to be free to leave if he or she wishes to do so. The pursuit and return by the police would be strong notice to appellant that henceforth she had best do as the police told her to do. Under those circumstances, appellant might well decide that if the police want to search, then by all means she had better let them do so.

The court of criminal appeals rejected this conclusion:

> While we might infer from Officer Graves' testimony that he intended for the polygraph operators to restrain appellant and force her to return to the police station, such evidence "is irrelevant except insofar as that may have been conveyed to the [appellant]." ... Appellant has offered no evidence that she was aware of Officer Graves' intentions. She has also offered no evidence that she was physically threatened or restrained, verbally intimidated, or otherwise compelled by others to return to and remain at the police station.
>
> This Court could only conclude that appellant was "seized" by indulging in speculation as to what convinced appellant to return to the police station and remain. While such a conclusion might be an attractive solution to a difficult question, it would require this Court to ignore its responsibility to decide questions based on facts as presented in the record.... Having found that appellant failed to meet her burden of proof, we must conclude that no Fourth Amendment seizure has been established.

*Russell II*, 717 S.W.2d at 11 (citations omitted). In effect, the court of criminal appeals has held that the record does not support an inference that Russell was forced to return to police headquarters.

■ The fact that Russell returned to police headquarters hysterical before giving her consent and confessions does not preclude a finding that they were voluntary. Although the record is not entirely clear whether Russell had completely calmed down before she signed the consent form, Graves did testify that upon her return he "got her a cold drink and some cigarettes and ... let her calm down." A reasonable inference from this testimony is that she had calmed down when she signed the consent form. Graves specifically testified that Russell was calm when she confessed.

■ The fact that Russell was only 16 years old does not preclude a finding that her consent and confessions were voluntary. Russell said she was 18 years old and acted like it. She was no stranger to the criminal justice system, on adult felony probation with another felony charge pending. Having cut a neighbor's telephone wires in anger and then beaten an old woman to death with a hammer, Russell was not the sort of person one would expect to be easily intimidated, even by police.[1]

The State met its burden of proving the voluntariness of Russell's consent to search and confessions by clear and convincing evidence, as determined by the district court, who was in the best position to judge the credibility of the witnesses. The district court did not err in concluding that blood-stained clothing found as a result of the search, the hammer Russell used to murder Mrs. Neal found as a result of her confessions, and her confessions themselves were all admissible.

## C

■ Russell still maintains that her consent violated section 51.09 of the Texas

---

1. From our conclusion that there is no evidence that the police intimidated Russell, the dissent somehow accuses that we have adopted a rule of weighted constitutional rights, and that we hold that "only 'nice' people are afforded a full measure of constitutional rights." Characterizing our attitude as "Olympian" and "lofty", the dissent charges that our reasoning would allow the police to have beaten Russell to obtain a confession. Of course, we espouse neither the rule nor the reasoning used as makeweight by the dissent to give their arguments the illusion of a force they otherwise lack. Russell is most assuredly endowed with the same constitutional rights as any person. Whether a person has been intimidated by police depends not upon his rights but rather upon his personal circumstances and the actions of the police. Needless to say, we do not hold that a person guilty of a heinous crime cannot be intimidated by police. We hold only that to determine whether police intimidation has occurred, not only must the conduct of the police be considered, but also the conduct and personality of the person with whom they dealt.

Family Code. We reaffirm the panel's original holding that this section of the Family Code does not apply to Russell's consent. *Russell I,* 672 S.W.2d at 586.

### D

█ Russell's consent to search authorized police to take from her residence any property used or possessed in violation of the law. Russell argues that her authorization did not extend to the bloody clothing the police seized. We disagree. Clothing worn while committing a murder is plainly "used" in violation of the law. Furthermore, it is a violation of the law for a person who knows that an investigation is in progress, as Russell clearly did, to conceal evidence pertaining to the investigation. Tex.Penal Code Ann. § 37.09(a)(1) (Vernon 1974). The seizure of evidence at Russell's house was within the scope of her consent to search.

### II

Russell argues that the district court erred in excusing for cause on its own motion a veniremen who was not absolutely disqualified. Russell also argues that the district court erred by charging the jury on the law of manslaughter after charging on the law of murder and applying the law of murder to the facts. Russell did not object at trial to either of these claimed errors and therefore cannot assert them on appeal.

### III

Russell's points of error are overruled, and the judgment of the district court is affirmed.

ENOCH, C.J., and STEWART, ROWE, BAKER, LAGARDE, THOMAS and McCRAW, JJ., join in the opinion of the Court.

STEPHENS and DEVANY, JJ., dissent with opinion.

WHITHAM, J., dissents with opinion, in which HOWELL, J., joins, and in which STEPHENS, J., concurs.

McCLUNG, J., did not participate in the decision of the case.

WHITHAM, Justice, dissenting.

I respectfully dissent. Today, the majority adopts a rule of *weighted* constitutional rights. I quote the majority:

> The fact Russell was only 16 years old does not preclude a finding that her consent and confessions were voluntary. Russell said she was 18 years old and acted like it. She was no stranger to the criminal justice system, on adult felony probation with another felony charge pending. Having cut a neighbor's telephone wires in anger and then beaten an old woman to death with a hammer, Russell was not the sort of person one would expect to be easily intimidated, even by police.

Therefore, according to the majority, only "nice" people are afforded a full measure of constitutional rights. The "not-so-nice" among us forfeit their constitutional rights by being wrong-doers. Thus, the majority reasons that because appellant acted like an eighteen year old instead of a sixteen year old; that because appellant was no stranger to the criminal justice system; that because appellant was on adult probation with another felony charge pending; that because appellant had cut a neighbor's telephone wires in anger; and that because appellant had then beaten an old woman to death with a hammer she could not be intimidated by the police as a matter of law. Hence, to the majority, the more wicked the accused, the less chance of a constitutional violation. Consequently, the majority sends each person to a police investigation with a "sliding scale" of constitutional rights. By the majority's reasoning, the police could have beaten appellant in order to obtain a confession, but not the upright reader of this opinion.

I disagree with the majority's Olympian approach. All constitutional guarantees extend both to the rich and the poor alike, to those with notorious reputations, as well as those who are models of upright citizenship. No regime under the rule of law could comport with constitutional standards that drew such distinctions. *Smith*

*v. United States,* 423 U.S. 1303, 1307–08, 96 S.Ct. 2, 4–5, 46 L.Ed.2d 9 (Douglas, Circuit Justice 1975). The constitutional rights of criminal defendants are granted to the innocent and the guilty alike. *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). Thus, I cannot accept the majority's lofty attitude toward determination of a person's constitutional rights. I disagree that a person's anti-social background determines the extent of the person's constitutional rights. I disagree that a person's anti-social background measures the standard of police conduct toward the person during a police investigation. In my view, the Constitutions of the United States and of the State of Texas afford the same rights to both saint and sinner. With this difference which the majority expressed, I turn to the disposition I would make of appellant's points of error which are dispositive of this appeal.

In her first point of error, appellant contends that the trial court erred in denying her motion to suppress her statements to law enforcement authorities. In a related second point of error, appellant contends that the trial court erred in denying her motion to suppress clothing seized from appellant's residence and the results of tests performed thereon, as well as a hammer found as a result of the search. This court reversed appellant's conviction. *Russell v. State,* 672 S.W.2d 583 (Tex.App.—Dallas 1984) (*Russell I*). The Court of Criminal Appeals reversed this court's judgment and remanded the cause to this court for further consideration of the admissibility of evidence resulting from the consent to search. *Russell v. State,* 717 S.W.2d 7, 11 (Tex.Crim.App.1986) (*Russell II*). Further, the Court of Criminal Appeals instructed us to decide two questions in determining the admissibility of evidence resulting from the consent to search:

> The issue remains, however, whether appellant's consent was, in fact, freely and voluntarily given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248 [93 S.Ct. 2041, 2058, 36 L.Ed.2d 854] (1973); *Bumper v. North Carolina,* 391 U.S.

> 543, 548 [88 S.Ct. 1788, 1791, 20 L.Ed.2d 797] (1968). Necessarily, the issue of the admissibility of appellant's confession also remains. If the consent to search was involuntary, then the confession might be the product of an illegal search. *See Brown v. Illinois,* 422 U.S. 590 [95 S.Ct. 2254, 45 L.Ed.2d 416] (1975). Because the Court of Appeals did not decide these issues, we must remand this cause to the Court of Appeals for further consideration.

*Russell II,* 717 S.W.2d at 11. The sequence of events was as follows: the consent to search, the search, the confession. We described this sequence and background information in *Russell I,* 672 S.W.2d at 585. Under the Court of Criminal Appeals' instructions we must decide whether appellant's consent to search was freely and voluntarily given and, if not, whether appellant's confession might be the product of an illegal search. In my view, the police search of appellant's residence violated her fourth amendment rights. To my mind, the appellant's subsequent oral confession to the police was the tainted fruit of the illegal search. Therefore, appellant's confession and other fruits of the search were erroneously admitted in evidence. Accordingly, I would reverse and remand.

Our prior opinion adequately sets out the facts and I will not repeat them here. *Russell I,* 672 S.W.2d at 585–86. Thus, I turn to the first determination required of us by the Court of Criminal Appeals—whether appellant's consent was freely and voluntarily given. In light of *Russell II,* I must make that determination on the basis that appellant was not under arrest or "seized" before she gave her consent. *Russell II,* 717 S.W.2d at 11. Nevertheless, when the State seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed. 2d 797 (1968). The State's burden is not

satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).

In the present case, I conclude that the consent was not obtained on the person's own familiar territory, but followed inherently coercive tactics. *See Schneckloth*, 412 U.S. at 247, 93 S.Ct. at 2058. As we pointed out in *Russell I*, "[t]he pursuit and return by the police would be strong notice to appellant that henceforth she had best do as the police told her to do. Under those circumstances, appellant might well decide that if the police want to search, then by all means she had better let them do so." *Russell I*, 672 S.W.2d at 588. Consider the facts of appellant's pursuit and return:

> About 7:00 o'clock a.m. on January 19, police officer Graves, a homicide investigator, transported appellant from her residence to the polygraph room at the police station. Graves heard from the polygraph examiners that appellant had run out of the polygraph room and was running down Main Street, a public street in the City of Dallas. Graves instructed the polygraph examiners "to go get her." The polygraph examiners did so. The record is silent on the details of the police pursuit of appellant. Appellant was returned to Graves' office crying and upset. Graves described appellant as "hysterical." Graves obtained cigarettes and a cold drink for appellant and "let her calm down." At 9:30 o'clock a.m., shortly after appellant was returned to Graves' office, appellant gave King a signed consent to search her residence. Graves gave appellant a *Miranda* warning after she was returned to his office and before she signed the consent.

*Russell I*, 672 S.W.2d at 585. The Court of Criminal Appeals found no arrest or seizure in these facts. *Russell II*, 717 S.W.2d at 11. Nevertheless, the Court of Criminal Appeals expressed no opinion on whether the pursuit and return constituted inherent-ly coercive tactics resulting in the consent to search.

Indeed, nothing in the record negates inherently coercive tactics on the part of police.

> Nothing occurred between appellant's hysterical return to Graves and the consent other than the possibility of a cigarette, a cold drink and the opportunity to calm down. The record is silent as to whether appellant smoked a cigarette, drank a cold drink or actually calmed down and returned to a non-hysterical state before she signed the consent.

*Russell I*, 672 S.W.2d at 588. Thus, on this record as a whole, I cannot say that the sixteen-year-old female appellant was acting from an independent act of free will when consent to search her residence was taken under the facts of the present case. In my view, the State has failed to establish that appellant's consent was "freely and voluntarily given." *Bumper*, 391 U.S. at 548, 88 S.Ct. at 1792. It follows, and I would so hold, that in the present case appellant's consent to search was not freely and voluntarily given.

I turn then to the question of whether the confession might be the product of an illegal search. In connection with this inquiry, the Court of Criminal Appeals refers us to *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Russell II*, 717 S.W.2d at 11. In *Brown*, the Supreme Court identified factors to be considered in determining whether a confession has been obtained by exploitation of an illegal arrest. *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Russell I*, 672 S.W.2d at 587. Therefore, I read *Russell II* to instruct this court that the factors identified in *Brown* are relevant and are to be considered in deciding whether the confession in the present case might be the product of an illegal search. Hence, I proceed on that basis.

Although appellant received a *Miranda* warning just before she signed the consent, the warning "cannot assure in every case that the Fourth Amendment violation has

not been unduly exploited." *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. The question of free will must be answered on the facts of each case. No single fact is dispositive. *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. In *Brown* and as reiterated in *Dunaway* the Supreme Court identified factors to be considered in determining whether a confession has been obtained by exploitation of an illegal arrest. *Dunaway*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. As summarized by our Court of Criminal Appeals in *Green v. State*, 615 S.W.2d 700, 708 (Tex.Crim.App.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed. 2d 258 (1981), those factors are:

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official misconduct.

In the present case there was a *Miranda* warning. The other three factors, however, are unfavorable to the State. We know appellant's trip to the police station began about 7:00 a.m. The record does not tell us the elapsed time between 7:00 a.m. and appellant's pursuit and return to Graves' office. We know that appellant signed the consent at 9:30 a.m. We know that Graves received the lab report resulting from the search between 11:00 a.m. and noon. We know that Graves immediately advised appellant of the results of the report. We know that appellant first confessed to Graves at 12:20 p.m. From the record as a whole, I conclude that the consent and later confession were in close proximity. Moreover, no circumstances intervened. Nothing occurred between appellant's consent and confession other than receipt of the lab report resulting from the search. With respect to official misconduct, I conclude that a sixteen-year-old who is voluntarily in a police station, and not under arrest, ought to be free to leave if he or she wishes to do so. The pursuit and return by the police would be strong notice to appellant that henceforth she had best do as the police told her to do. Under those circumstances appellant might well decide that if the police want a confession, then by all means she had better give them a confession. In the present case, considering all the *Brown* factors as a whole, I cannot say that the sixteen-year-old female appellant was acting from an independent act of free will when she confessed. Instead, I conclude that appellant's confession was the product of an illegal search.

Accordingly, I would hold that the search of appellant's residence was unlawful. Appellant's confession followed the unlawful search. A confession subsequent to an unlawful search is a fruit of the search and, therefore, inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Barber v. State*, 611 S.W.2d 67, 69 (Tex. Crim.App.1981). Therefore, I would hold that the trial court erred in denying appellant's motion to suppress her January 19 statements. Consequently, I would sustain appellant's first point of error. It follows and, I would so hold, that the clothing seized from appellant's residence, the results of tests performed on that clothing and the hammer found as a result of the search were illegally obtained in violation of appellant's fourth amendment rights. Consequently, I would hold further that the trial court erred in denying appellant's motion to suppress clothing seized from her residence and the results of tests performed on that clothing, and a hammer found as a result of the search. Thus, I would sustain appellant's second point of error.

Before concluding this opinion, I attempt an explanation of the sequence of appellant's points of error. On remand we ordered re-briefing. To accommodate to the issues we must decide on remand, appellant understandably reversed contentions and arguments under her original first two points of error. Nevertheless, to maintain

the original order of things, I address the issues on remand in the order initially advanced and argued by appellant in her original brief under her original first two points of error. Therefore, when I would sustain appellant's first point of error, I would also sustain appellant's second point of error in her brief on remand. Likewise, when I would sustain appellant's second point of error, I would also sustain appellant's first point of error in her brief on remand.

For the reasons stated, I would reverse and remand.

DEVANY, Justice, dissenting.

The majority would persuade the reader to its view by giving a lurid account of the appellant striking the victim "again and again" with comments as though, in omniscient style, the account was from a viewpoint of an eye witness.

An appellate review should be restricted to the question of whether the confession was obtained in violation of appellant's constitutional rights. It matters not how bad this majority can "paint" appellant to assess the *degree* of her constitutional rights. The gruesomeness of this crime can in no way measure the constitutional rights of an accused. *Cf. Ex parte Duffy,* 607 S.W.2d 507, 526–27 (Tex.Crim.App.1980). In a dissenting opinion, Judge Phillips restated this fundamental principle of law: "Although the crime committed was heinous, the rule of law must still control our determination." *Franklin v. State,* 606 S.W.2d 818, 832 (Tex.Crim.App.1978).

While realizing that "constitutional inquiry into the issue of voluntariness requires more than a mere color-matching of cases," *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967), the totality of circumstances goes to the events surrounding the confession, not the crime that an accused may or may not have committed. None of the cases cited by the majority state that an analysis of the voluntariness of a confession includes a consideration of the manner in which the crime was committed. In fact, the Texas Court of Criminal Appeals specifically stated that "[t]he determination of whether a confes-sion is voluntary must be based upon examination of the totality of the circumstances surrounding *its* acquisition." *Barton v. State,* 605 S.W.2d 605, 607 (Tex.Crim.App. 1980) (emphasis added). To consider the appellant's actions of cutting the telephone wires and beating "an old woman to death with a hammer" in determining whether appellant's confessions were voluntary, results in a "rule of weighted constitutional rights" as Justice Whitham states in his dissent. It does not necessarily follow that a person who is capable of committing a heinous crime would not be intimidated by police officers. The majority's analysis as to the voluntary nature of appellant's confessions is unpersuasive.

Accordingly, I vigorously dissent from such a standard for determining the application of a fundamental constitutional right.

STEPHENS, Justice, dissenting.

I concur in the legal analysis advanced by Justice Whitham in his dissenting opinion concerning the violation of appellant's constitutional rights and I agree that the cause should be reversed and remanded. However, I decline to concur in the characterization afforded the majority author's reasoning in either Justice Whitham's dissenting opinion or in Justice Devany's dissenting opinion.