

NUMBER 13-08-00551-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

DENNIS WAYNE LIMON, JR.,                                            Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

On appeal from the 36th District Court of
of San Patricio County, Texas.

# O P I N I O N

### Before Justices Yañez, Benavides, and Vela
### Opinion by Justice Benavides

Appellant, Dennis Wayne Limon, Jr., was convicted of deadly conduct with a firearm, a third-degree felony, and sentenced to three years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. *See* TEX. PENAL CODE ANN. § 22.05 (Vernon 2003); *id.* at § 12.34 (Vernon Supp. 2009). By a single issue, Limon argues that the trial court erred by denying his motion to suppress illegally-obtained evidence. We reverse and remand.

# I. BACKGROUND

Limon was indicted for the offense of deadly conduct with a firearm on August 14, 2007. On October 10, 2007, Limon filed a "Motion to Determine the Admissibility of Illegally Obtained Evidence and Statements." The trial court held a hearing on the motion on October 23, 2008.

Officer Gus Perez testified at the hearing on the motion to suppress that on June 28, 2007, he received a call at about 10:00 p.m. informing him that there was a shooting in Aransas Pass at the 1400 block of W. Matlock. On his way to that location, Officer Perez was advised that another shooting had occurred. He proceeded to the location of the second shooting, at 244 N. 11th Street.

At the scene of the second shooting, Officer Perez recovered three "shotgun waddings," which he described as projectiles from a shotgun. He spoke to a witness named "Lupe Ortiz" or "Guadalupe Ortiz," who advised that he had seen a green four-door car leaving the area. Ortiz could not provide a make, model, or license plate for the car. The rest of the witnesses at the residence were reluctant to cooperate.

Officer Perez then proceeded to the location of the first shooting. When he arrived, he was approached by a "person that live[d] in the vicinity who advised [him] that that person believed that the Limon kids were involved." Officer Perez admitted that he did not know the name of his informant, but he believed the person was a neighbor or resident that lived in the area.

Officer Perez testified that he knew of only one Limon family in Aransas Pass, and he knew where they lived. He went to the Limon residence, arriving at approximately 2:00 a.m., where he observed a green Buick four-door car. He felt the hood, which he stated was warm, and observed what appeared to be a bullet hole in the front passenger door. Officer Perez testified on cross-examination that the bullet hole indicated to him that the car had been shot at. Officer Perez then called for backup, and three other officers arrived within minutes.

Officer Perez testified that he did not have a search warrant or an arrest warrant,

2

and it would have taken him about an hour and a half to two hours to get a warrant. Officer Perez went to the front door and knocked. The door was answered by A.S. Officer Perez testified that he knew that Limon's father (hereinafter "Limon, Sr."), an adult, lived in the residence. On direct examination during the pretrial hearing, Officer Perez testified about A.S.'s identity and their encounter:

[State]:      Do you know who [A.S.] is?

[Perez]:      At the time I did not, but I later learned that [he] was a nephew of Mr. Limon and a cousin of the Defendant.

[State]:      Okay. How old is [A.S.]? Do you know?

[Perez]:      I'm not aware, sir.

[State]:      Is he an adult?

[Perez]:      I do not believe so.

[State]:      What did you tell [A.S.], if anything?

[Perez]:      I advised [A.S.] that I was investigating a shooting case and asked for permission to enter the residence.

[State]:      And did he let you come in?

[Perez]:      Yes, sir, he did.

[State]:      Did any other officers come in with you?

[Perez]:      Yes, sir, Officer Hernandez.

On cross-examination, Officer Perez further testified about the entry into the home:

[Defense]:      And as you stood on the front porch how long a conversation did you have with this young man who is a juvenile [A.S.]?

[Perez]:      It was a fairly short conversation. I advised him who I was, what department I was with[,] and why I was there.

[Defense]:      And did you ask him if he owned or had possession of that residence?

[Perez]:      I assumed that because he opened the door that he was one

of the residents.

[Defense]:    Okay. And did you ask him if there was someone there who was the owner or had greater right of possession to that residence?

[Perez]:    No, sir, I did not.

[Defense]:    And at the time that he approached[,] you indicated that you felt or you knew that he was not an adult; is that correct?

[Perez]:    No. I indicated that I found out he wasn't an adult, but he's not a young kid. I believe he is maybe 14, 13, somewhere in that area.

[Defense]:    So at the time you weren't sure?

[Perez]:    That's correct.

[Defense]:    Did you ask him for any identification?

[Perez]:    No, sir, I did not.

[Defense]:    Did you ask him how old he was?

[Perez]:    No, sir, I did not.

[Defense]:    Did you ask him what grade he had gone to school?

[Perez]:    No, sir, I did not.

Officer Perez testified that while he was outside the home, he did not see any crimes visibly being committed inside or outside the home. He stated that when he arrived at the front door, he had a "reasonable suspicion that there was a suspect inside. . . . It was likely—I didn't know. It was approaching probable cause but more than a reasonable suspicion."

Once inside the home, Officer Perez smelled marijuana. He stated that he and Officer Hernandez went to the bedroom in the southwest corner of the residence, where they observed Limon and two other males lying in bed, apparently sleeping with the lights

4

on. The officers had their guns drawn, and they told Limon and the two males to get up. Limon was handcuffed and moved into the common area of the home.

Officer Perez stated that another officer, Officer Rhodes, was outside the residence looking through a window into the southwest bedroom, and he informed Officer Perez that he saw weapons in the room. Officer Perez stated that "[t]here was [sic] two handguns towards the front where their heads were to the west side of the bed at which point we went ahead and detained everybody in the residence, secured them all so we could secure those weapons and see if there was [sic] any other weapons." Officer Perez stated that one of the handguns was a .22 caliber handgun and the other was a .380 caliber handgun.

Officer Perez testified that one of the officers went into the southeast bedroom, which belonged to Limon's parents, who were sleeping. Limon, Sr. was not dressed, and Mrs. Limon had a nightgown on. Both were handcuffed. Mrs. Limon was taken to a common area in the home, and Limon, Sr. was told to lie face down on the floor, despite being completely naked. Officer Perez testified that the officers "went ahead and got him some clothes, removed the hand restraints, and that's when we asked for consent."

Officer Perez stated that he asked for a written consent to search from Limon, Sr., who stated that he wanted to speak to his wife because he could not see. Mrs. Limon then gave written consent to search the home.

After obtaining consent, Officer Perez photographed the residence, and he testified that ammunition for a .22 caliber gun and a 12-gauge shotgun were found in the southwest bedroom, along with drug paraphernalia. He stated that, outside the residence in the vicinity of the southwest bedroom, the officers located a "Remington semiautomatic shotgun 12 gauge." Officer Perez agreed that the shotgun was "near the window of the southwest bedroom" in an area enclosed by a privacy fence belonging to the Limon

residence.

After searching the residence and finding the guns, Officer Perez obtained consent to search the vehicle from Limon, who stated that his parents bought the vehicle for him to drive. In the vehicle, Officer Perez found a metal jacket from an unknown caliber weapon.

Officer Perez testified that at that time, he "felt that there was probable cause for the arrest," and he arrested Limon. Limon was transported to the police station and booked, which took approximately one hour. Limon was in the jail for about thirty minutes before he was given his *Miranda* warnings; following the warnings, at 5:01 a.m., he provided a statement.

The trial court denied Limon's motion to suppress without stating the grounds or issuing findings of fact and conclusions of law. At trial, when the State attempted to admit Limon's videotaped statement, the following exchange occurred:

[Defense]: Excuse me, Ms. Cable. Judge, at this time I would reassert the motions filed prior to trial, and I object to any testimony regarding those matters.

The Court: Would y'all come up for a second?

*(Bench conference)*

[State]: There was a motion to suppress the statement, and it was denied by Judge Whatley.

The Court: I'm showing an [sic] October of 2007 Judge Whatley heard that motion.

[Defense]: Right. And so I'm reasserting it for the purposes of getting a Court's ruling into the record on this matter.

The Court: Fine. I just want to be sure that we're all on the same page.

[Defense]: That is when we had it, October.

6

[State]: I don't remember the date.

[Defense]: Yeah.

[State]: I rely on the docket sheet.

[Defense]: And then—well, go ahead.

The Court: The Court will adopt the prior rulings of Judge Whatley in this matter. Your objection is overruled.

The evidence obtained from the search of the residence, the search of the car, and Limon's statement were admitted at trial, and Limon was convicted of deadly conduct by use of a firearm. *See id.* at § 22.05(b)(2), (e).

## II. STANDARD OF REVIEW

An accused seeking suppression of evidence based on an alleged unlawful search and seizure bears the burden of rebutting the presumption that the police conduct was proper. *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App.1986); *Harris v. State*, 994 S.W.2d 927, 930 (Tex. App.–Waco 1999, pet. ref'd). To rebut the presumption, the accused must show that the search or seizure occurred without a warrant. *Johnson v. State*, 864 S.W.2d 708, 714 (Tex. App.–Dallas 1993), *aff'd*, 912 S.W.2d 227 (Tex. Crim. App.1995); *Harris*, 994 S.W.2d at 930. The burden of proof then shifts to the State to either produce a warrant or prove that the warrantless search or seizure was reasonable. *Russell*, 717 S.W.2d at 10; *Harris*, 994 S.W.2d at 930. Limon argued in his motion to suppress that the search of the home was made without a warrant in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I, section 9 of the Texas Constitution, and articles 1.04, 1.06, and 38.23 of the Texas Code of Criminal Procedure. U.S. CONST. amend. IV, XIV; TEX. CONST. art. I, § 9; TEX. CODE CRIM. PROC.

7

ANN. arts. 1.04, 1.06, 38.23 (Vernon 2005).[1] Thus, the burden shifted to the State to prove an exception to the warrant requirement.

"Voluntary consent to search is a well-established exception to the warrant and probable cause requirements of the Fourth Amendment to the United States Constitution." *Montanez v. State*, 195 S.W.3d 101, 105 (Tex. Crim. App. 2006). While under the federal constitution, the State must prove consent by a preponderance of the evidence, our State constitution requires the state to prove voluntary consent by clear and convincing evidence. *Id.* (citing TEX. CONST. art. I, § 9).[2]

"[W]hen reviewing a trial court's decision to deny a motion to suppress, an appellate court 'should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor.'" *Id.* (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We afford the same deference to rulings applying law to fact questions, otherwise known as mixed questions of law and fact, "'if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.'" *Id.* (quoting *Guzman*, 955 S.W.2d at 89). "Finally, an appellate court may conduct a de novo review where the resolution of mixed questions of law and fact does not turn on an evaluation of credibility and demeanor." *Id.* Where a trial court does not enter any findings of fact, we must view the evidence "'in the light most favorable to the trial court's ruling'" and "'assume that the trial court made implicit findings of fact that support its ruling as long as those

---

[1] Limon did not argue below, and does not argue to this Court, that the standards for admitting evidence under any of these provisions is different from the federal constitutional analysis.

[2] In the trial court, the State relied upon only one exception to the warrant requirement: consent to search. Because the State was required to justify the warrantless search, we limit our discussion to this ground.

8

findings are supported by the record.'" *Id.* (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). "[W]hether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent are mixed questions of law and fact which reviewing courts should examine *de novo*." *Hubert v. State*, No. PD-0493-09, 2010 WL 2077166, at *3 (Tex. Crim. App. May 26, 2010).

### III. A.S.'s CONSENT TO ENTER THE RESIDENCE

The Fourth Amendment to the United States Constitution provides:

> [t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Article I, section 9 of the Texas Constitution further provides that:

> [t]he people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9. A search without a warrant is presumed to be unreasonable, but there are exceptions to the warrant requirement. *See Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). One exception is consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).

Consent to enter and search property can be given either by the individual whose property is searched or by a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Patrick v. State*, 906 S.W.2d

9

481, 490 (Tex. Crim. App. 1995). "Common authority" is "mutual use of the property by persons generally having joint access or control for most purposes." *Patrick*, 906 S.W.2d at 490. "Although property interests are relevant to this determination, the commonality of authority to consent is not determined solely by the law of property." *Hubert*, 2010 WL 2077166, at *3. Rather, we look to whether it is "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at *3-4. The State bears the burden of proving actual authority by presenting facts that show mutual use of and control over the property by the third person. *Id.* at *4.

When the facts do not support a finding of actual authority, a search may be valid if the consent-giver is clothed with apparent authority. *Rodriguez,* 497 U.S. at 188. A law enforcement officer's warrantless search of a person's premises may be justified under the doctrine of "apparent authority" when consent to search is obtained from a third party whom the officers reasonably believe at the time of the search to possess common authority over the premises, but who does not, in fact, possess such authority. *Id.* at 186-89. A third party's consent is valid if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 188. The State has the burden to prove apparent authority, *id.* at 181, and this burden is not met if, when faced with an ambiguous situation, the officer nevertheless proceeds without making any further inquiry. *Id.* at 186-89. If the officers do not learn enough and if the circumstances fail to clarify whether the property is subject to common authority by the consent-giver, then the warrantless search is unlawful.

*Id.*

It is undisputed that A.S. was Limon, Sr.'s nephew and Limon's cousin. The testimony presented by the State at the suppression hearing does not provide any information regarding whether A.S. lived at the Limon residence or was just visiting. Officer Perez testified that he did not inquire as to A.S.'s use of or control over the property. Based on this lack of evidence, it is clear that the State failed to demonstrate that A.S. had actual authority to consent to the officers' entry into the home. *Cf. Hubert*, 2010 WL 2077166, at *5-6 (holding that the evidence was sufficient to justify an implied finding that the defendant's grandfather was the exclusive owner of the home and validly consented to a search of the defendant's bedroom). Moreover, consent to enter a home is different than consent to search the premises, and there was no evidence presented that A.S. had actual authority to allow the officers to proceed to Limon's bedroom for a search of the room. *See Alberti v. State,* 495 S.W.2d 236, 237 (Tex. Crim. App. 1973) ("[A]n invitation to officers to enter a residence ordinarily cannot be construed as an invitation or consent to search."). Thus, the warrantless entry can only be sustained if the facts available would warrant a person of reasonable caution in the belief that A.S. had authority over the premises under the doctrine of apparent authority.

Officer Perez testified at the suppression hearing that he knew that A.S. was not an adult, that he believed A.S. was thirteen or fourteen years old, and knew that the house belonged to Limon, Sr., an adult. Officer Perez admitted that he did not ask A.S. if he lived at the house, if he had possession or control of the house, how old he was, or what grade he attended at school. Rather, he told A.S. he was a police officer there to investigate a shooting and then asked for permission to enter. The dissent would conclude that because

11

A.S. opened the front door of the home at 2:00 a.m., Officer Perez reasonably concluded that A.S. was a resident of the house.[3]  But this logic is flawed for several reasons.

First, mere presence at a residence is insufficient to support a reasonable belief that the person has authority to consent to a search.  The State must present more evidence than mere presence to support a finding of apparent authority.  *See, e.g., United States v. Cos*, 498 F.3d 1115, 1129 (10th Cir. 2007); *Riordan v. State,* 905 S.W.2d 765, 772 (Tex. App.–Austin 1995, no pet.) (holding that mere presence and relationship to defendant does not justify conclusion that person has apparent authority).  A.S.'s mere act of answering the door in the middle of the night did not, by itself, justify Officer Perez's conclusion that A.S. had authority to consent to entry into the home, and more specifically, into Limon's bedroom, particularly given that Officer Perez knew that an adult owned and resided on the premises.

Second, a child is generally incapable of waiving his own rights without any instruction or guidance, and is even less fit to surrender the rights of another.  *See Reynolds v. State*, 781 S.W.2d 351, 355 (Tex. App.–Houston [1st Dist.] 1989, pet. ref'd) (holding that consent given by the defendant's twelve-year-old son was not effective).  More importantly, however, a child who may have been awakened from his or her slumber at 2:00 a.m. is unlikely to be thinking clearly or capable of making a reasoned decision whether to admit officers into the home.  *See* Matt McCaughey, *And a Child Shall Lead Them: The Validity of Children's Consent to Warrantless Searches of the Family Home*, 34 U. LOUISVILLE J. FAM. L. 747, 749 (1996) ("[C]hildren are far less likely to understand the

---

[3] The State did not file a brief in this case; thus, we are without the benefit of any argument on its behalf.

consequences of their consent, and thus, some may not have the capacity to consent voluntarily to a warrantless search."). Officer Perez did not testify that he advised A.S. of the consequences of his consent to search or that A.S. understood those consequences and made a reasoned decision.

These circumstances created an ambiguity that Officer Perez was obligated to resolve before entering the home, requiring him to ask further questions, such as whether the child actually lived at the home, whether the child's parents were available, whether the child understood that he did not have to consent, or whether the child wished to consult an adult on the premises. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973) (holding knowledge of the right to refuse consent is one factor to be taken into account in the totality of circumstances); *see Riordan,* 905 S.W.2d at 772 (holding that officer could not rely on cursory conversation to establish apparent authority). Had Officer Perez simply asked A.S.'s name, he would have realized that A.S. did not share the same last name as Limon, Sr. Upon that discovery, Officer Perez should have asked to speak to Limon, Sr., instead of relying on a thirteen- or fourteen-year-old's consent to enter. The State did not meet its burden to present evidence demonstrating a reasonable belief that A.S. had authority to allow the officers to enter.[4]

The dissent cites *Russell v. State*, concluding that permission to search a residence

---

[4] The dissent claims that we are creating a "new rule of law for police to follow when conducting searches" because we are requiring officers to ask minors certain questions to make sure the minor has authority to permit entry. *See Limon v. State*, ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi _____, 2010, no pet. h.) (Vela, J., dissenting). Not so. Rather, we are enforcing the well-established rule that an officer may not proceed in an ambiguous situation without first verifying that the person purporting to consent to the entry has authority to do so. *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990). Here, an ambiguity existed not just because A.S. was a minor, but also because Officer Perez knew that Limon, Sr. owned the house and it was 2:00 a.m. When a child answers the door at 2:00 a.m., and the officer knows who owns the home, it is not unreasonable to require an officer to determine if the child lives in the home, and if not, ask to speak to the owner, which Officer Perez did not do.

given by a minor has been held to be sufficient. 739 S.W.2d 923, 928 (Tex. App.–Dallas 1987, pet. dism'd w.o.j.). The facts of that case, however, are readily distinguishable. In that case, Russell was a sixteen-year-old girl who was being investigated for murder. *Id.* at 925-26. Russell spoke to the police on her front doorstep and agreed to go with them to the police station to give a statement. *Id.* At the police station, Russell informed the police that she was on adult felony probation and told the officers that she was eighteen years of age instead of providing her true age of sixteen. *Id.* According to the court of appeals' recitation of facts, the officers had no reason to disbelieve Russell when she told them her age, as she appeared mature. *Id.* at 926.

The next day, Russell returned to the police station for a polygraph test, and after the test, the officers asked for her consent to search her residence. *Id.* The officer explained to Russell that she could refuse consent and that she was under investigation for murder. *Id.* Russell signed the consent. *Id.* The search of her residence uncovered evidence connecting her to the alleged murder. *Id.* Russell moved to suppress the evidence at her trial, claiming that her consent was not voluntary because she was a minor. *Id.* The court disagreed, explaining as follows:

> The fact that Russell was only 16 years old does not preclude a finding that her consent and confessions were voluntary. Russell said she was 18 years old and acted like it. She was no stranger to the criminal justice system, on adult felony probation with another felony charge pending. Having cut a neighbor's telephone wires in anger and then beaten an old woman to death with a hammer, Russell was not the sort of person one would expect to be easily intimidated, even by police.

*Id.* at 928.

*Russell* is distinguishable because that case did not concern a child's apparent authority to search a residence, but rather, involved the voluntariness of a minor's consent.

14

*Id.* There are no facts in *Russell* indicating suggesting that another person controlled the property that was searched. *Id.* Second, *Russell* involved a sixteen-year-old girl who lied to police and told them she was an adult, and there was no reason to doubt the veracity of her story. *Id.* Finally, and most importantly, *Russell*, while probably reaching the correct result, was poorly reasoned, as pointed out by the dissent in that case, and appears to state that the voluntariness of consent turns on whether the person is of a savory character. *Id.* at 929-30 (Whitham, J., dissenting). Thus, we find *Russell* inapposite and hold that the State did not present evidence to justify the warrantless entry into the home based on the apparent authority of A.S.

## IV. APPLICATION OF THE EXCLUSIONARY RULE

At the suppression hearing, the State argued that the evidence obtained at the residence could be admitted at trial because after the entry into the home, Limon's parents consented to a search of the residence. Limon argues that his parents' consent to search the home was tainted by the illegal entry into the home; therefore, all the evidence discovered pursuant to the consent should be excluded. Limon further argues that his statement given to police after his arrest, which was based on the illegally-obtained evidence, was tainted by the police conduct and should have been excluded. We agree.

### A. The Limons' Consent to Search

As the Supreme Court has explained,

[t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so

15

attenuated as to dissipate the taint."

*Murray v. United States,* 487 U.S. 533, 537 (1988). To determine whether consent to a search, following the police's illegal entry onto premises, is tainted by the illegal entry, we must look to the following factors:

> (1) the temporal proximity between the unlawful entry and the given consent; (2) whether the warrantless entry brought about police observation of the particular object for which consent was sought; (3) whether the entry resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent, and (6) whether the police purpose underlying the illegality was to obtain the consent.

*Stone v. State,* 279 S.W.3d 688, 693 (Tex. App.–Amarillo 2006, pet. ref'd) (adapting the factors set forth in *Brick v. State*, 738 S.W.2d 676 (Tex. Crim. App. 1987), to an unlawful entry followed by consent to search).

First, the consent occurred shortly after the police entered the Limon home and swept the home for weapons. This factor weighs in favor of exclusion of the evidence. *Id.*

Next, Officer Perez testified that he was investigating the shooting and did not have probable cause to arrest Limon at the time he arrived at the home. Officer Perez was looking for evidence relating to the shootings, and the illegal entry into the home allowed him to view guns in the southwest bedroom, providing him with further suspicion that Limon was involved.[5] The subsequent consent to search the rest of the home further revealed ammunition in that bedroom. Accordingly, this factor supports exclusion of the evidence.

---

[5] Although Officer Perez testified that another officer outside a window to the southwest bedroom pointed out the guns to Officer Perez, the State did not attempt to justify the admission of the handguns into evidence based on the other officer's ability to view them from outside the residence. In fact, the evidence showed that the area outside the southwest bedroom was enclosed in a privacy fence, and the State did not offer any testimony showing that the officers could have viewed the handguns from outside the privacy fence. Thus, the State did not show that the area was not curtilage that is protected by the Fourth Amendment. *See Pool v. State,* 157 S.W.3d 36, 41 (Tex. App.–Waco 2004, no pet.). Accordingly, the officers would not have been able to search the yard without either a warrant or consent.

*Id.*

Third, there was flagrant misconduct in this case. Officer Perez obtained information from an unidentified person that the "Limon kids" were involved in the shootings. In fact, he admitted that at the time he arrived at the Limon house, he had a reasonable suspicion that a suspect was in the house, but he did not have probable cause. He testified that he went to the Limon residence to "investigate" at 2:00 a.m. Upon encountering A.S. at the door, Officer Perez made absolutely no inquiry as to A.S.'s authority to consent to his entry, and he and the other officers immediately proceeded to the back bedroom of the house, where Limon was sleeping. Limon and the two other males in the bedroom were handcuffed and moved to the common area of the house. Limon's parents, who Officer Perez had no reason to suspect as being involved in the shootings, were awakened from their sleep in the middle of the night. Limon, Sr. was handcuffed and made to lie face-down on the floor—naked. *See Green v. State*, 615 S.W.2d 700, 708 (Tex. Crim. App. 1980) (holding police misconduct was flagrant where the defendant was awakened from his sleep and arrested in the middle of the night at gunpoint and without clothing). Although Limon, Sr., was allowed to get dressed and his handcuffs were removed before the officers asked for consent, there was no significant time lapse between these events. Under these circumstances, this factor weighs in favor of excluding the evidence. *See Brown v. Illinois*, 422 U.S. 590, 605 (1975) (holding that the manner of arrest indicated it was "calculated to cause surprise, fright, and confusion," where the arrest was based on an anonymous tip, and the defendant was ambushed by police officers at gunpoint on his way home); *see also Bell v. State*, 724 S.W.2d 780, 790 (Tex. Crim. App. 1986) (listing cases where flagrant misconduct was found).

Fourth, the consent was not volunteered, but was requested, which favors exclusion of the evidence. Fifth, the Limons were made aware of the right to refuse consent, which favors admitting the evidence. Finally, the State did not present any evidence on whether the police purpose underlying the illegality was to obtain the consent, but as stated above, the police misconduct justified such a conclusion. *See Brown*, 422 U.S. at 605. When taking these factors together, it is clear that the State failed to meet its burden to prove that the taint from the illegal entry had sufficiently dissipated before the consent was given. *See Brick*, 738 S.W.3d at 681 (holding that the burden is on the State). Accordingly, all of the evidence discovered at the residence should have been excluded.

## B.   Limon's Statement

Next, Limon argues that because all of the evidence discovered at the house was illegally obtained, and Officer Perez did not have a warrant for his arrest, his arrest was illegal, and therefore, the statement he gave to the police while in custody should be excluded. Officer Perez admitted that at the time he sought permission to enter the Limon residence, he did not have probable cause to arrest Limon and he did not have a warrant. Officer Perez testified that after the search of the residence, which we have held was illegal, he believed he had probable cause to arrest Limon and took him to the police station. Shortly after his arrival, Limon gave a statement to police that was relied upon to obtain his conviction.

Here, Limon's arrest was illegal because it was without a warrant, and the information necessary to establish probable cause was the result of the illegal entry and search of the home. *Sturchio v. State,* 136 S.W.3d 21, 25 (Tex. App.–San Antonio 2002, no pet.) ("Because the warrantless arrest and search incident to arrest that led to the

18

discovery of the cocaine were based on the illegal seizure of the crack pipe, they were illegal as well. Consequently, the evidence obtained as a result of the pat down, warrantless arrest, and search incident to arrest should have been suppressed."). To determine whether a defendant's statement, given after an illegal arrest, was attenuated from the illegality, we must look at (1) the giving of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official conduct. *Brown*, 422 U.S. at 603-04; *Bell*, 724 S.W.2d at 788.

First, it is undisputed that Limon received *Miranda* warnings before giving his statement. This fact, however, does not carry much weight in the analysis. *Bell*, 724 S.W.2d at 788. "[E]ven repeated warnings alone are not enough to purge the taint of an otherwise illegal arrest." *Id.* Second, the statement was given shortly after Limon's arrest. Officer Perez testified that it took an hour from the time of Limon's arrest to transfer him to the police station and book him, and Limon was in jail for thirty minutes before Officer Perez read him his *Miranda* rights and obtained the statement. *See id.* at 788-89 & n.4 (holding that a time span of one to three hours is considered "close temporal proximity"). Third, according to Officer Perez, there were no intervening circumstances. Officer Perez denied having any conversations with Limon, nor did Limon have any significant time to reflect or consult with anyone prior to his statement. *Id.* at 788-89. Finally, our analysis of the purpose and flagrancy of the police conduct is the same as our analysis of the taint resulting from the improper entry of the home. *Id.* at 789-90. Accordingly, Limon's statement was not attenuated from the taint of the illegal entry and search of the residence,

19

and should have been excluded.[6]

## V. HARMFUL ERROR

Limon argued below and argues to this Court that the evidence in this case was obtained and admitted at trial in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. *See* U.S. CONST. amend. IV, XIV. Because the error below was constitutional, we apply the harmless error analysis under Texas Rule of Appellate Procedure 44.2(a). *See Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Rule 44.2(a) provides that "[i]f the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). While this rule does not explicitly place the burden on the State to show harmless error, "the 'default' is to reverse unless harmlessness is shown. Thus, if neither party does anything, the case will be reversed. This requires the State to come forward with reasons why the appellate court should find the error harmless." *Merritt v. State,* 982

---

[6] The dissent would refuse to consider Limon's final argument, characterizing Limon's challenge to the statement as being based on the illegal search of the vehicle, not the residence. The dissent concludes that the evidence does not show that Officer Perez coerced Limon into consenting to the vehicle search, and that Limon did not object to the admission of his statement on the basis that a written consent to search the vehicle was not admitted at trial.

The brief should not be so narrowly construed. The dissent picks out one isolated statement from the brief and presents it as if it constitutes the entirety of Limon's argument. The argument portion of the brief is not divided into distinct sections. Rather, the argument attacks each police action in chronological order, spending significant time discussing all aspects of the initial entry into the home, the protective sweep, and the consent to search the home. The brief then mentions the search of the car in a brief sentence set off as a separate paragraph—most likely because the search of the vehicle did not reveal any relevant, damaging evidence, but rather, revealed ammunition from an unknown caliber weapon that was never tied to the crime at issue. In the next paragraph, the brief launches into a discussion of the exclusionary rule, initially stating that "[Limon's] statement was obtained after his warrantless arrest based on this warrantless search."

Rather than narrowly reading this sentence of the brief to invoke a waiver of rights, as the dissent does, we read the brief as a whole and construe the statement to refer to the brief's prior discussion of the warrantless search of the residence. We hold that Limon did not waive his argument at trial because he obtained a ruling outside the presence of the jury, *see* TEX. R. EVID. 103, and he did, in fact, reassert his objection to the admission of the statement based on the prior warrantless search of the residence.

S.W.2d 634, 637 (Tex. App.–Houston [1st Dist.] 1998, no pet.) (citing *Arnold v. State*, 786 S.W.2d 295, 298 (Tex. Crim. App. 1990) (placing the burden on the State to show harmless error under former rule 81(b)(2), the predecessor to rule 44.2(a)); *see also Davis v. State,*195 S.W.3d 311, 317 (Tex. App.–Houston [14th Dist.] 2006, no pet.). The State has not filed a brief in this case and has provided us with no argument or any reason why the constitutional error in this case was harmless beyond a reasonable doubt. Accordingly, we reverse and remand for a new trial.

## VI. CONCLUSION

For all the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings.

_____
GINA M. BENAVIDES,
Justice

Dissenting Opinion by
Justice Rose Vela.

Delivered and filed the
17th day of June, 2010.

21